## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA**

**v.**

**MARKEITH THOMAS (#2), ARTHUR OTT (#3), BRENTON MITCHELL (#6), SHANQUITA POTTS (#12), and LARTAURUS BRIDGES (#14),**

    **Defendants.**

**CRIMINAL ACTION FILE NO.**

**1:18-cr-141-MLB-AJB**

## UNITED STATES MAGISTRATE JUDGE'S ORDER
## AND FINAL REPORT AND RECOMMENDATION

Before the Court are the following pretrial motions: Shanquita Potts's motion for a bill of particulars, [Doc. 215]; Brenton Mitchell's motion for a bill of particulars, [Doc. 241]; Brenton Mitchell's motion to suppress search and seizure of vehicle on April 15, 2018, [Doc. 242]; Markeith Thomas's motion to suppress evidence, [Doc. 281]; Brenton Mitchell's motion to strike alias, [Doc. 336]; Arthur Ott's motion to suppress evidence, [Doc. 365]; Brenton Mitchell's motion to dismiss Count Six, [Doc. 372]; Lartaurus Bridges's motion for a bill of particulars, [Doc. 511]; Lartaurus Bridges's motion to dismiss indictment for lack of venue,

[Doc. 512]; Lartaurus Bridges's motion for severance, [Doc. 513]; Lartaurus Bridges's motion for speedy trial, [Doc. 566]; and Lartaurus Bridges's supplement to motion to sever, [Doc. 584].

For the following reasons, the undersigned (1) **RECOMMENDS** that Brenton Mitchell's motion to suppress search and seizure of vehicle on April 15, 2018, [Doc. 242], Markeith Thomas's motion to suppress evidence, [Doc. 281], and Arthur Ott's motion to suppress evidence, [Doc. 365], be **DENIED**; (2) **RECOMMEND**S that Brenton Mitchell's motion to dismiss Count Six, [Doc. 372], and Lartaurus Bridges's motion to dismiss indictment for lack of venue, [Doc. 512], be **DENIED**; and (3) **DENIES** Shanquita Potts's motion for a bill of particulars, [Doc. 215], Brenton Mitchell's motion for a bill of particulars [Doc. 241], Lartaurus Bridges's motion for a bill of particulars, [Doc. 511]; Brenton Mitchell's motion to strike alias, [Doc. 336], Lartaurus Bridges's motion for severance, [Doc. 513], Lartaurus Bridges's supplement to motion to sever, [Doc. 584], and Lartaurus Bridges's motion for speedy trial, [Doc. 566].

The Court first will address the suppression motions and then discuss the remaining motions.

I.  **MOTIONS TO SUPPRESS, [Docs. 242 (Mitchell), 281 (Thomas), 365 (Ott)]**

A.  **FACTS**

The suppression motions concern law enforcement's actions following the landing of two privately-chartered planes, the first on December 22, 2017 at Fulton County Airport, also known as Charlie Brown Airport, and the second on April 15, 2018 at Peachtree-DeKalb Airport ("PDK"); as well as the arrest and search of Defendant Ott in June 2018. The Court held two evidentiary hearings. [Doc. 517 (hereinafter "T1:__") and Doc. 518 (hereinafter "T2:__")].

1.  **December 2017**

a.  **The December Flight**

Defendant Terrell Davis,[1] a musical recording artist, was a passenger on a private chartered flight from California to Georgia on December 22, 2017. T1:6-7, 12, 15.[2] The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")

─────────────────────

[1]    Davis indicated that he was going to enter a guilty in this matter, his pretrial motions, including his motions to suppress, were deemed withdrawn, and his case was certified ready for trial. [Doc. 752].

[2]    There is no evidence that Davis was directly observed on the flight.

3

was contacted by the Drug Enforcement Administration ("DEA") with a tip that the flight might be carrying controlled substances. T2:22. The plane was a large private jet and the charter was paid for by Davis. T1:8, 27.[3] The aircraft arriving from California landed at the Charlie Brown Field of Fulton County Airport, in Atlanta, Georgia, some time before dawn. T1:6-8. After landing, it pulled up to a fixed-base operator ("FBO"). T1:8. An FBO is a private company; FBOs usually allow vehicles to drive directly to an aircraft, instead of loading or unloading an aircraft at a terminal. T1:19-20. Furthermore, the passengers and cargo at an FBO are not required to go through TSA security. T1:20. The DEA and ATF, along with the Federal Bureau of Investigation ("FBI") and that Georgia State Patrol ("GSP"), had established surveillance offsite but could see onto the airfield. T2:22.

Once the plane landed, two vehicles approached the aircraft: a black 'Sprinter'-style van and a Ford Econoline van. T1:8. Passengers and flight crew exited the aircraft. Def. Exh. 1 from evidentiary hearing held March 12, 2019 (T2)

---

An individual wearing a distinctive red and green outfit got off the flight that night and, around 8:00 AM, Davis was observed at his residence wearing said outfit. T1:12.

[3]     Agents did not know Davis paid for the flight until sometime after it had landed. T1:27.

4

at 4:42-5:35 (hereinafter "Plane Video at _")]; T1:8 (stating that there were are total of eleven people exiting the plane).[4]  Some of the passengers wore "Famerica" clothing, but it is unclear when law enforcement first observed the clothing.  T1:31-32.[5]  The Econoline van drove to the rear of the aircraft, next to the cargo hold.  T1:8.  Approximately 37 large rectangular packages were unloaded from the aircraft and into the Econoline van.  T1:9; Plane Video at 6:36-11:09.  The packages were wrapped in Christmas-style wrapping paper.  T1:9.  No FBO personnel aided in unloading the plane.  T1:22.

### b.    The Stop of the Econoline Van

Agents surveilling the aircraft did not wish to have their presence known and allowed the Econoline van, carrying the rectangular packages, to drive away from the area.  T1:10.  The surveilling agents claimed that the van was observed not to have its headlights or taillights illuminated when it left the airport before dawn.

---

[4]    Some persons re-entered the plane after exiting.  Plane Video at 5:53-6:07.

[5]    "Famerica" is the name of Davis's record label but law enforcement claimed it also was the name of a gang (also sometimes referred to as "Famgoon") that Davis and others started and which law enforcement has investigated for criminal activity.  T2 at 31-32.

T1:9; T2:25.  However, the video of the plane shows a van (not a Sprinter-style van), driving away from the plane with headlights illuminated.  Plane Video at 13:10-14:22.  The taillights appear dim or off in this video (when the brake is not in use).  Plane Video at 13:10-14:22.

Federal agents requested a GSP Trooper to stop the van after allowing the van to get some distance away from the airport.  T1:9-10.  GSP Trooper Ian Moremen had been told it may be carrying controlled substances.  T2:19.

Moremen testified that as he saw the van driving down a road it had no headlights illuminated.  T2:9.  Conversely, the driver of the van, defendant Arthur Ott, testified that he turned on the lights "immediately" when he got into the van to drive off the airport base and never turned them off thereafter.  T2:40, 43.  Ott explained that to turn both the taillights and headlights on in the van, he pushed a certain button on the steering wheel twice.  T2:40.  He further explained that if the headlights of the van are illuminated, the taillights will automatically be on as well.  T2:42.

Moremen's vehicle recorded the traffic stop from a dashcam video camera.

T2:18-19.[6]  On this video, between the video turning on and the van stopping (excluding when the brake is applied), the Econoline van's taillights appear to be dim, if on at all.  Def. Exh. 2 from evidentiary hearing held March 12, 2019 (T2) at 05:34:27-05:34:59 (hereinafter "Dash Video at _")].  The van's headlights cannot be seen from the camera's vantage point; at times it appears that there may be mild light on the road in front of the Econoline van, but that is highly unclear, and it is also unclear which vehicle(s) is/are the sources of any light.   Dash Video at 05:34:26-05:34:45; [Doc. 538, Att. 1 (still image of this video, purporting to show light cast from headlights)].  The van was stopped while it was still dark outside and light precipitation was falling.  Dash Video at 05:35:00.

Moremen stopped the van shortly after 6:00 AM for having its lights off. T2:9.[7]  He can be heard on this video saying, "PC on this stop is a van driving with no headlights."   Dash Video at 05:35:45-05:35:47.   He testified that he could

---

[6]     Moremen's vehicle's camera system automatically records and saves video beginning fifteen seconds before the vehicle's blue lights are ignited and records audio beginning upon the ignition of the vehicle's blue lights.  T2:18-19.

[7]     Moremen's testimony textually indicates the van's *headlights* were off, but contextually he seems to have been talking about both headlights and taillights. T2:9.

immediately smell marijuana as he got out of his vehicle to approach the van. T2:12.  He could see a large stack of packages wrapped in wrapping paper in the back windows of the van and assumed they were Christmas presents.  T2:11-12; *see also* Gov. Exh. 1 from evidentiary hearing held March 8, 2019 (T1) (hereinafter "March 8 Govt. Ex. _")].  Moremen went up to the passenger window of the van and continued to smell marijuana.  T2:12.

Moremen observed three people in the Econoline van.  T2:13.  Moremen identified himself, informed the individuals that they were stopped for not having their lights illuminated, and requested the individuals identify themselves.  Dash Video at 05:35:42-05:35:47; T2:13.[8]  Defendant Arthur Ott was the driver.  T2:15, 39.[9]  Kevin Harp and Defendant Markeith Thomas[10] were passengers, T2:15-16,

---

[8]     The two passengers said they did not have identification on them, so they were asked to write their names and dates of birth down.  Dash Video at 05:36:09-05:36:27.   Shortly afterward, another officer arrived and shined his flashlight to inspect the packages in the van through the rear window.  Dash Video at 05:36:04-05:36:07.

[9]     Ott also testified that he was on the December flight.  T2:46.  He testified that he did not smell the marijuana when in the driver's seat of the van. T2:47.

[10]    In his testimony, Moremen referred to Thomas as "Thomas Markeith." T2:15.

although Thomas gave a fake name and date of birth that failed to find a match on the trooper's computer database.  Dash Video at 05:37:37-05:37:50, 05:42:30-05:45:10.

Moremen was having a hard time talking to the driver of the van from the passenger side window and asked Ott to exit the van and come to the rear of the vehicle to talk.  T2:13.  Moremen noticed that a backup officer had arrived to assist him.  T2:13.  He requested that the remaining two occupants of the van exit and sit on the curb behind the vehicle.  Dash Video at 05:38:50-05:39:05; T2:13.[11]  At this time, Moremen informed all three former occupants of the van that he smelled marijuana and asked if there were any narcotics in the vehicle.  Dash Video at 05:39:22-05:39:30; T2:13-14.  One of the passengers admitted to having marijuana on his person and handed over a "handful" of rolled marijuana cigarettes.  T2:14; *see* Dash Video at 05:40:47-05:40:53.

Based on the smell of marijuana and the marijuana that had been handed over, Moremen informed the three persons that he would search the van.  Dash

---

[11]    Moremen never questioned Ott alone before asking the others to exit the vehicle.  Dash Video at 05:38:12.

9

Video 05:39:55-05:39:59; T2:14.  He proceeded to briefly search the van.  Dash Video 05:46:48-05:47:04.  Through a tear in the wrapping of one of the packages he saw a green leafy substance.  T2:14.[12]  Ott, Harp, and Thomas were handcuffed within thirty seconds of when Moremen began searching the van.  Dash Video at 05:47:12.  They were told they were being arrested.  Dash Video 05:47:35-05:47:38.

The package with the torn corner was opened, revealing a large transparent bag of marijuana.  Dash Video at 05:47:45-52.  Orr, Thomas, and Harp were searched and their phones and other items were seized.  Dash Video at 05:48:15-05:49:10.  Defendant Antoine Morrison's (who was not present) California medical marijuana certificate was found in a bag in the van.  Dash Video at 06:04:00-06:04:14.

Officers drove the Econoline van from the scene.  Dash Video at 06:19:42-06:20:20.  Eventually, thirty-seven packages were found in the van, comprised of approximately 520 pounds of marijuana, worth approximately one million dollars.  T1:11, 13; T2:14-15.  Harp claimed the marijuana as his.  T1:35; *see* Dash Video 05:46:35-05:46:45 (prior to search, claiming all contents in van to be his).  The van

---

[12]     The substance was later confirmed to be marijuana.  T2:14.

10

was registered to Davis.  T1:12.

### c.   Return to Compound after the December Flight

After leaving the airport, Davis rode in the Sprinter van to a compound he owned.  T1:11-12.  This location ("the Compound") already was under surveillance through a pole camera installed and monitored by the law enforcement.  T1:11-12. Law enforcement, including ATF Special Agent James Nash, who was part of the surveillance team at the airport, could watch footage from the camera on their mobile phones.  T1:12.  Agents noticed an individual wearing a unique red and green outfit get off the plane, then later observed at the Compound, and then around 8:00 AM, the agents again saw someone dressed in this outfit outside the Compound, finally identifying the wearer as Davis.  T1:12, 42.

### d.   Davis's Social Media Postings in December

Davis's Instagram account also was monitored by law enforcement.  T1:13. When initially leaving to go to California, Davis had posted video on Instagram that he and others were leaving on a flight.  T1:13.  The day of the return flight, sometime after the stop of the Econoline van and confiscation of the marijuana within it, Davis posted on Instagram a picture of himself and text stating, "I've lost more than an [*sic*] man have gained in a lifetime . . . Have you ever lost ah million

11

dollars at one time??? After losing $300k weeks b4 an [*sic*] still up!!! #Alhumdulillah." March 8 Govt. Ex. 2; T1:13. The marijuana confiscated from the Econoline van that morning was worth approximately one million dollars. T1:13.

### 2. April 2018

### a. Visit to an Area with High Marijuana-Growing Activity in California

Davis returned to California sometime in April 2018. T1:15. A tour bus operator contacted one of the law enforcement agencies investigating Davis to report that Davis was planning a tour bus trip from Georgia to California, with a stop in New Orleans. T1:15. The tour bus had Davis's picture on the side of the vehicle and it was advertising his new music record. T1:15. The driver of Davis's tour bus reported seeing a very large amount of cash on board. T1:15-16.[13]

Although the tour bus stayed in the Sacramento, California area, Davis and members of his entourage rented vehicles and drove about five hours north to an

---

[13]     Agent Nash testified that, as far as he knew, this information was relayed from the driver to the owner of the bus company (or someone similar) and then to the FBI. T1:42.

area known as "Murder Mountain."  T1:16.  Murder Mountain is known to host a

vast amount of legal (under California state law) and illegal marijuana growing

activity.  T1:16-17, 36.  Agents were not visually surveilling Davis at this point but

were tracking him through location-monitoring of his cell phone, for which they

had a search warrant.  T1:17-18, 35.  Cell phone coverage around Murder Mountain

was described by Agent Nash as "sporadic"; nonetheless, the agents had a "good

idea of a good area" where Davis was located.  T1:17-18.  Eventually, through

tracking Davis's cell phone, agents knew that he returned to Sacramento, California,

specifically to McClellan Airport, on the night of April 14.  T1:18-19.

### b.      Flight Back to Georgia

ATF agents were on scene at McClellan Airport and observed Davis and

others get out of vehicles and onto a plane.  T1:18-19.  Seventeen rectangular

packages were unloaded from the vehicles onto the plane, wrapped in white

wrapping paper.  T1:19, 40.  The aircraft departed shortly after 9:00 PM PST on

April 14.  T1:20.[14]  Based on the similarity of the packages observed to the

_____

[14]      The flight was again paid for by Davis, but this fact might again have
been unknown by the agents until after the flight had landed and persons were

13

December 2017 flight and based on Davis's travel in California (to Murder Mountain), agents suspected contraband was on board the plane.  T1:38, 39, 40.

The agents in California were able to get the tail number of the aircraft, which then allowed agents to track the plane's flight using iPhone applications. T1:19-21.  The plane flew approximately five hours to Georgia.  T1:21, 36.  The flight plan indicated that the plane was headed to Kennesaw airport, but about 25 minutes prior to landing it changed plans to land at PDK.  T1:21.  Agents learned of the change in flight plan through the phone application.  T1:21-22.  Agents were prepared at both airports.  T1:21-22.

The agents at PDK were in contact with the FBO.  T1:22.  The FBO supervisor reported to the agents that the flight crew had radioed to request that no ground crew aid in unloading the plane, which the FBO supervisor stated he had never heard of in his 20 years on the job.  T1:22.  The December 2017 flight was similarly unloaded without help from the FBO's ground crew.  T1:22.  Agents observed the plane land at approximately 5:15 AM on April 15.  T1:33.

_____

detained.  T1:27-28.  Some of the passengers of the flight were wearing "Famerica" clothing, although it is unclear when law enforcement realized this fact.  T1:31-32.

14

### c.   Vehicles Arrive

Through the pole camera, the agents observed two vehicles leave the Compound sometime prior to the flight landing.  T1:23.  One vehicle was a black Chrysler 300 and the other was a Ford Econoline van.  T1:23.  Before the vehicles left, someone wearing a backpack got into the back seat of the Econoline van. T1:23.

These two vehicles showed up at the PDK FBO and drove up to where the plane landed.  T1:24.  The Econoline van backed up to the rear cargo hold of the plane, which agents could observe through the open cargo-hold door contained packages.  T1:24-25.  The Chrysler pulled up to the front steps of the plane and some personal belongings were loaded into it.  T1:25-26, 45.  Two people got into the Chrysler (a driver and one passenger) and drove away, driving to the front parking lot of the building.  T1:25, 32.[15]

### d.   Arrests and Seizures

Law enforcement initiated a stop of the Chrysler.  T1:32, 36-37.  The

_____

[15]    The Chrysler was parked next to the plane for several minutes before leaving.  T1:46.

15

Chrysler was stopped by a GSP Trooper in the front parking lot of the airport and did not enter the commercial roadway.  T1:32, 48, 49.

The driver and passenger of the Chrysler were secured.  T1:32.  No opportunity was given to the occupants to call someone to drive the vehicle away; instead, the Chrysler was seized.  T1:32, 51.  Law enforcement drove the vehicle back to the rear of the building near the plane.  T1:32.  The ATF manual states that "[a]n inventory search will be conducted on all conveyances taken into custody."  March 8 Govt. Ex. 5.  Accordingly, an inventory search of the Chrysler was conducted.  T1:32.

Defendant Brenton Mitchell was in the driver's seat of the Chrysler when it was stopped.  T1:26.  Mitchell is not alleged to have been on the flight.  T1:26.[16] He was arrested.  A firearm was eventually found under the driver's seat (Mitchell's seat) of the Chrysler.  T1:55.[17]

William Rhodes was in the passenger seat of the Chrysler.  T1:26.  He was

--------

[16]     Nash assumed Mitchell drove the Chrysler from the Compound to the plane; however, Mitchell was not positively identified until the stop of the Chrysler. T1:27, 45.

[17]     It is not clear when in time the firearm was found.  T1:55.

16

allegedly on board the flight.  T1:26.[18]  Rhodes was arrested.  T1:33.  A firearm was found in a bag in the passenger seat (Rhodes's seat).[19]  T1:55.

After agents directed the stop of the Chrysler, they emerged onto the scene around the plane.  T1:27.  A GSP vehicle approached with blue lights on and agents came out in full police gear.  T1:28.  The Econoline van was seized.  T1:32.  Four or five people were in the van and they were detained.  T1:27.

Agents observed the rear cargo door of the plane being slowly closed.  T1:28. The agents commanded whoever was closing the door come out but there was no response.  T1:29.  A team boarded the aircraft and searched it with a K-9 dog. T1:29.  Eventually, Davis was found hiding in the cargo hold.  T1:30.

The agents could smell marijuana near the cargo hold.  T1:30.  Seventeen white packages were found in the cargo hold, containing about 440 pounds of marijuana.  T1:30-31.  None of these packages had been placed into the Econoline van.  T1:34.

---

[18]     It is unclear from the transcript whether Rhodes was identified as he got off the flight or whether agents simply observed an individual get off the flight and into the car, later identifying Rhodes.  T1:66.

[19]     It is also not clear when in time this firearm was found.  T1:55.

Bilal Muhammad was found inside the Econoline van when the agents emerged onto the scene.  T1:52.  Muhammad had no firearms or drugs on his person.  T1:52-53.  Two cellphones were taken from him.  T1:56-57.[20]

### 3.   June 2018 Arrest of Arthur Ott

By June 2018, a federal arrest warrant for Defendant Ott (the driver of the Econoline van in December 2017) had been sent to the U.S. Marshal's Service ("USMS").  Gov't Ex. 2 from evidentiary hearing held March 12, 2019; T2:29.[21]  On June 19 or 20, 2018,[22] the USMS received information that Ott was at a certain motel.  T2:31.  Inspector Frank Lempka of the U.S. Marshal's Service parked in the parking lot of the motel to do general surveillance.  T2:31.  At least two other Deputy Marshals were on scene and more were on the way.  T2:31.  One Marshal observed Ott walk out of the hotel and enter the passenger seat of a car.  T2:32-33.  The deputies followed the car onto the highway.  T2:32.  Lempka caught up to the

---

[20]   The record is unclear whether these phones were taken from Muhammad's person.  T1:57.

[21]   In addition to a federal warrant, there was a state warrant for Ott for a probation violation.  T2:34.

[22]   There's some uncertainty as to whether this was on June 19 or 20.  T2:30, 35.

car and observed Ott in the passenger seat.  T2:33-34.

Lempka requested that a GSP unit conduct a stop of the car.  T2:33-34. Lempka stopped further ahead of where the trooper had stopped the vehicle in which Ott was riding, and by the time Lempka walked back toward Ott, Ott and the driver had already exited their vehicle and were either handcuffed or in the process of being handcuffed.  T2:34, 38.  A gun was found on Ott's person.  T2:38.

### 4.     Motions to Suppress

Mitchell has moved to suppress any evidence taken from the search of the Chrysler in April 2018.  [Doc. 242 at 1].   Thomas has moved to suppress "all tangible and derivative evidence seized from" him.  [Doc. 281 at 1].  Ott has moved to suppress evidence from the traffic stop of the Econoline van in December 2017 and from the search, seizure, and his arrest in June 2018.  [Doc. 365 at 1].

### B.     DISCUSSION

### 1.     December 22, 2017 searches and arrests

Ott and Thomas challenge the stop of the Econoline van.  [Docs. 538 (Ott's post-hearing brief), 555 (Thomas's post-hearing brief)].   Both have standing to challenge the stop even though the van was registered to Davis.  *Brendlin v. California*, 551 U.S. 249, 258-59 (2007) (concluding that passenger, as well as

19

driver of vehicle are seized under the Fourth Amendment when police officer subjects them to traffic stop).  The Government argues that Moremen had probable cause to stop the van because its taillights were not working.  [Doc. 538 at 4-6, 12-14].  Ott argues that probable cause was lacking because Moremen first reported at the scene and testified that the van did not have its headlights illuminated without mentioning the taillights, and the video at the airport clearly shows the headlights illuminated.  [Doc. 538 at 6-7].  He also argues that his own testimony is that the lights were on, and the dashcam video shows that the headlights were illuminated. [*Id.* at 7].

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983).  A search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location.  *Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).  " '[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment—subject only to

20

a few specifically established and well-delineated exceptions.' " *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)); *see also United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. . . .  The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted).   The burden to establish the application of the warrant exception is by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972)).  A preponderance of the evidence simply means an amount of evidence that is enough to persuade the court that the existence of a fact

is more probable than its non-existence.  *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997); *see also United States v. 4 Meadowbrook Lake Condominium, Unit 308, Condominium # 8, Located at 314 SE 10th Street, Dania, Florida 33004*,  No. 06-60079-CIV-COHN/SNOW,  2007 WL 809681,  at  *3 (S.D. Fla. Mar. 15, 2007) ("A preponderance of the evidence means that the United States 'must present an amount of evidence sufficient to persuade the court that the claim or contention is more likely true than not true.' ") (citing Eleventh Circuit Pattern Jury Instructions, Civil (2000), Basic Instruction 6.1, Burden of Proof).

"A traffic stop, which is a seizure within the meaning of the Fourth Amendment, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with  *Terry [v. Ohio]*, 392 U.S. 1 [(1968)]."  *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations and quotation marks omitted); *United States v. Lee*, 68 F.3d 1267, 1270-71 (11th Cir. 1995) (noting that *Terry* applies to traffic stops).  If there is not probable cause to believe a traffic violation has occurred, police officers may conduct a brief investigatory stop of a vehicle "if they have a reasonable, articulable suspicion based on objective facts that an individual is engaged in criminal activity." *United States v. Harris*, 526 F.3d 1334,

22

1337 (11th Cir. 2008) (quotation marks omitted).  "A determination of reasonable suspicion is based on the totality of the circumstances," and the issue is "whether, given the circumstances, reasonable suspicion objectively existed to justify [the investigatory stop]."  *Id.* at 1337-38 (quotation marks omitted); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Criminal activity includes even minor traffic violations.  *See United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003).  Reasonable suspicion can be formed while observing legal activity.  *Harris*, 526 F.3d at 1337.  "Additionally, the issue is not whether the particular officer involved 'actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify [the investigatory stop].' "  *Id.* at 1338 (quoting *United States v. Nunez,* 455 F.3d 1223, 1226 (11th Cir. 2006)).

There is a two-part inquiry for determining whether an investigative stop is reasonable: (1) whether the officers had reasonable suspicion to seize the individual; and (2) whether the stop was reasonably related in scope to the circumstances which justified the stop initially.  *United States v. Acosta*, 363 F.3d 1141, 1144-45 (11th Cir. 2004) (citing *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).  The officer must "be able to point to specific

23

and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant" the intrusion of a traffic stop. *Terry*, 392 U.S. at 21.

At a minimum, reasonable suspicion supported Moremen's stop of the Econoline van. Although the dashcam video is not definitive as to whether the van's headlights were illuminated at the time of the stop, several facts point to the veracity of Moremen's testimony that it appeared that the van's taillights were not working. O.C.G.A. §§ 40-8-23(d) ("Any taillight or taillights, together with any separate light for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlights or auxiliary driving lights are lighted."). The vehicle was stopped at approximately 6:00 AM, and in any event, it was still dark out. *See* O.C.G.A. § 40-8-20 ("Every vehicle upon a highway within this state at any time from a half-hour after sunset to a half-hour before sunrise . . . and at any other time when there is not sufficient visibility to render clearly discernible persons and vehicles on the highway at a distance of 500 feet ahead shall display lights, including headlights, and illuminating devices as required in this part for different classes of vehicles. . . ."). First, at the very least, the taillights of the Econoline van were exceptionally dim. Second, the dashcam video reflects that the

24

license plate on the van was hardly visible until Moremen's headlights were shining on it, thus corroborating Moremen's testimony that the taillights were out. That the light on the license plate was malfunctioning is established by comparing the appearance in the dashcam video of the van's license plate to how visibly illuminated the license plate was on the vehicle that the Econoline van is observed passing on the roadway just before it was pulled over. The lack of illumination on the license plate corroborates that the taillights were not working properly. Third, compared to the vehicle that the van passed on the roadway, the Econoline van's taillights were not illuminated.

The surveillance video from the airport confirms that the taillights were not properly illuminating. After the plane arrived at the FBO, Plane Video at 03:00, the Ford Econoline van is first seen parked, with its headlights off, on the port side of the airplane. *Id.* at 03:35. The plane's front passenger door began to open at *id.* at 04:35, and passengers began to disembark at *id.* at 04:42. Two persons exited the plane and the first person off of the plane appeared to get into the driver's seat of the van. *Id.* at 04:55. The headlights were illuminated on the van, *id.* at 04:59, and the van was moved forward (right to left on the screen) and as it passed the vantage point of the agent videoing the scene, the van's taillights were not

25

illuminated. *Id.* at 05:04. One of the surveilling agents reported that the van moved to other side of the plane. *Id.* at 05:11. After the packages were unloaded from the plane via its rear passenger door and placed into the van, *id.* at 11:37, the surveilling agents reported, and the video confirms, that the brake lights on the van were momentarily illuminated. *Id.* at 12:31-:37. At *id.* at 13:07, the van began to move, again on the port side of the plane from right to left. While its headlights were illuminated, its taillights were illuminated only momentarily, as if the brake lights were temporarily engaged. *Id.* at 13:11. The van then stopped in front of the plane, *id.* at 13:27, and when it began moving again, as it left the FBO, again the taillights were illuminated only when the brake lights came on. *Id.* at 13:46-:50. When the van pulled over and stopped following Moremen turning on his blue lights, the taillights do not appear to be illuminated. Dash Video at 00:12.[23]

---

[23]     In addition to what is displayed on the videos as described in the text, the Court rejects that Ott's testimony that the taillights were illuminated. First, Ott's testimony that the taillights were illuminated when he turned on the headlights is speculative, because there is no evidence that Ott observed, or was in a position to observe, the taillights illuminated just because he turned on the headlights. Second, Ott's testimony that he did not smell the odor of 540 pounds of marijuana in the van, T2:47, renders his other testimony less than credible.

Thus, Moremen's stop of the van was a lawful *Terry* stop since it was supported by reasonable suspicion, if not probable cause, that the Econoline van's taillights were not on and/or operating in compliance with O.C.G.A. §§ 40-8-20, 40-8-23(d).  Since reasonable suspicion/probable cause is viewed objectively, it is irrelevant that Moremen stopped the van for having its headlights off.

Once Moremen stopped the van and exited his trooper car, he detected the smell of marijuana, giving rise to probable cause to believe that the van contained marijuana.  The odor of marijuana by itself establishes probable cause for a warrantless search of a vehicle. *See, e.g.*, *United States v. Flippo*, 759 Fed. Appx. 907, 909 (11th Cir. Jan. 7. 2019) (finding odor of marijuana provides probable cause for warrantless search) (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982).  If a vehicle is readily mobile and there is probable cause to believe that it contains contraband, law enforcement may search the vehicle without a warrant.  *United States v. Rodriguez*, 762 Fed. Appx. 938, 942 (11th Cir. Mar. 12, 2019) (citing *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014)).  This automobile exception does not contain a special exigency requirement beyond a showing that the vehicle is mobile.  *United States v. Watts*,

329 F.3d 1282, 1285 (11th Cir. 2003).   Mobility is inherent if the vehicle "reasonably appear[s] to be capable of functioning."   *Id.* at 1286 (quotation omitted).   There is no dispute that the van was mobile since it was being operated on the public roadway until stopped by Moremen.

As a result, the van and the packages of marijuana were properly searched, *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005); *see also Baldwin*, 774 F.3d at 720 ("[o]nce probable cause exists to search the vehicle, the police may search all part of the vehicle, and any containers therein, where the object of the search might be found")  (citing *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999).   Therefore, Ott and Thomas[24] were lawfully arrested.   Accordingly, the Court

---

[24]   As a passenger in the Econoline van, Thomas lacks standing to challenge the search of the van and he has not established a legitimate expectation of privacy in the van to allow him to challenge any of Moremen's actions beyond stopping the van.  The burden is on the defendant to establish a legitimate expectation of privacy, that is, that he has standing to challenge a claimed Fourth Amendment violation. *United States v. Chayes*, 169 F.3d 687, 690 (11th Cir. 1999).   The Fourth Amendment's protections extend to any place or thing with respect to which a person has a "reasonable expectation of privacy," *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).   "By contrast, an individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *United States v. Ross*, 963 F.3d 1056,

1062 (11th Cir. 2020) (en banc) (citing *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997)).  Fourth Amendment rights are personal rights that may not be asserted vicariously. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  This is a threshold issue. *Ross, id.*

In *Rakas*, the Supreme Court held that the defendants did not have a legitimate expectation of privacy in the glove compartment or area under the seat in a car in which they were "merely passengers." *Rakas*, 439 U.S. at 148-49. "Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Id.* Thus, a "passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns it or rents it." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).

*Brendlin* does not change this principle of law.  In *Brendlin*, the Supreme Court framed the issue solely as whether a traffic stop subjects a passenger, as well as the driver, to a Fourth Amendment seizure. *Brendlin*, 551 U.S. at 249.  The Court also remarked that in the courts below Brendlin did not challenge the search of the driver' s vehicle, citing *Rakas. Brendlin*, 551 U.S. at 252.  The Supreme Court in *Brendlin* concluded that a passenger, as well as the driver of a vehicle, are seized under the Fourth Amendment when a police officer subjects them to a traffic stop, not only when they are formally arrested.  As a result, the Court held, the passenger of a vehicle has standing to challenge the constitutionality of a traffic stop. *Brendlin*, 551 U.S. at 258-59.  But by citing to *Rakas* and noting that Brendlin was not challenging the search of the vehicle but only his seizure, the *Brendlin* Court didn't overrule or alter *Rakas*' holding about a vehicle passenger's ability to challenge the search of another's vehicle.

Second, with *Rakas* still being good law, the Court is bound by Eleventh Circuit precedent that holds that a passenger with no possessory interest in the vehicle lacks standing to challenge the search of the interior of that vehicle. *United*

**RECOMMENDS** that their motions to suppress, [Doc. 281 (Thomas), 365 (Ott, as it relates to the stop and search of the van on December 22, 2017)], be **DENIED**.[25]

_____

*States v. Dixon*, 901 F.3d 1322, 1338-39 (11ᵗʰ Cir. 2018); *see also Lee*, 586 F.3d at 865 ("Inasmuch as Lee asserted no property or possessory interest in the Lexus, he has failed to meet his burden of establishing a legitimate expectation of privacy in the glove compartment in which the gun was discovered."); *Harris*, 526 F.3d at 1338 (holding that a "passenger[ ] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car") (citing *Rakas*, 439 U.S. at 140, 134 n.12, 148); *see also Lewis v. United States*, 491 Fed. Appx. 84, 86 (11ᵗʰ Cir. Oct. 1, 2012) ("As for the March 2007 search, Lewis was a passenger and therefore only had standing to contest the vehicle stop.") (citing *Brendlin*, 551 U.S. at 251); *United States v. Ubaldo-Viezca*, 398 Fed. Appx. 573, 579 (11ᵗʰ Cir. Oct. 6, 2010) ("Although Ubaldo-Viezca appears to argue that . . . *Brendlin* . . . held that passengers have standing to challenge vehicle searches, *Brendlin* addressed a passenger's standing to challenge the constitutionality of the initial traffic stop, rather than the search of the vehicle in which he is riding. . . . Accordingly, the district court did not err in finding that Ubaldo-Viezca lacked standing to challenge the search of the Expedition and trailer.") (internal citations omitted).

[25] Since the Court concludes that Moremen had either reasonable suspicion or probable cause to stop the Econoline van, the Court need not address the Government's alternative argument that Moremen's stop was justified as a reasonable mistake of fact. [*See* Doc. 535 at 17-20].

**3.     April 15, 2018 arrest of Mitchell and seizure and search of Chrysler 300**

**a.     Arguments**

The Government argues that probable cause supported Mitchell's arrest April 15, 2018.  It contends that probable cause existed based on the following facts: law enforcement knew that Davis was responsible for the 520 pounds of marijuana seized in December 2017; in the April 2018 trip, Davis and some of his companions had gone to Humboldt County, California, and the remote Murder Mountain area where large marijuana-growing farms are located; at the Sacramento Airport, 17 large rectangular packages placed on the April 2018 plane were consistent with those located and seized in December 2017;  the FBO supervisor at the PDK airport reported that the chartered plane had declined ground crew service, which was very unusual in the supervisor's experience; the scope of Davis's operation suggested a large conspiracy, since there were charter jets, multiple flights to California, multiple vehicles greeting the jets, 520 pounds of marijuana seized in December 2017 that Davis bemoaned about yet sounded unfazed about losing $1 million, and many of his accomplices were wearing "Famerica" clothing; agents expected persons from the Compound to greet the marijuana-laden plane

31

and consistent with this expectation they observed the Chrysler 300 sedan and a van leave the Compound and arrive at the airport for the plane's arrival; when the plane arrived, the Econoline van backed up to its cargo hold while the Chrysler went to the plane's front steps where it received suitcases from the plane; Rhodes got off of the plane and entered the Chrysler; and the Chrysler was stopped as it was leaving the airport area.  [Doc. 539 at 18-19].  It contends that these facts establish more than a probability or substantial chance that Mitchell was a member of the conspiracy, and that Mitchell and the van driver were exactly who the agents reasonably anticipated would arrive at the airport early in the morning and "bring the conspiracy down the home stretch."  [*Id.* at 19 (citing *United States v. Willis*, 759 F.2d 1486, 1489 (11th Cir. 1985))].  The Government argues that until Mitchell and the van driver showed up, the conspirators were without means to transport the marijuana and the plane's passengers away from the airport and analogizes his role to that of a getaway-car driver.  [*Id.* at 19-20 (citing *United States v. Gonzalez*, 157 Fed. Appx. 124, 127 (11th Cir. Nov. 18, 2005) (upholding denial of minor-role adjustment to robbery getaway-car driver))].  The Government then submits that having arrested the defendants, the ATF impound and inventory policy permitted the warrantless search of the Chrysler and the Econoline van.  [*Id.* at 20].

32

Alternatively, the Government contends that law enforcement had reasonable suspicion to briefly detain Mitchell, which reasonable suspicion ripened into probable cause upon the discovery of the marijuana packages in the charter plane. [*Id.* at 20-22].

In response, Mitchell argues that hardly any of the Government's factual contentions as to the existence of probable cause apply to him.  Instead, he argues, the only facts pertinent to him are that he arguably drove the Chrysler from the Compound to the airport, parked it in front of the plane, personal luggage from the plane was placed in the Chrysler's trunk, plane-passenger Rhodes got into the front seat of the Chrysler, and Mitchell began driving away.  [Doc. 546 at 5].  He argues that none of the suspected marijuana packages were transferred from the plane to the Chrysler, and, in fact, the Econoline van was the vehicle parked near the cargo door of the plane to accept those packages (as occurred in December 2017). [*Id.* at 5-6].  He further argues that there is no evidence connecting him to the December 2017 flight, which, he submits, involved two vans, the Sprinter and Econoline, better suited to transport marijuana away from the plane.  [*Id.* at 7].  He analogizes his situation to that in *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007), where the Eleventh Circuit held that probable cause was lacking

33

where neither the defendant or his vehicle were known to law enforcement despite a lengthy investigation, the defendant had just left a location of suspected drug activity, he appeared to have control over a garage door that closed without anyone else being seen, and he had misstated where he had been to the police. [Doc. 546 at 8 (citing *Virden*, 488 F.3d at 1231)]. Mitchell argues that, like *Virden*, before April 15, 2018, law enforcement did not know who he was and did not see him at or leave the Compound. Further, only personal luggage was placed inside the Chrysler and there is no indication that controlled substances were transported in personal luggage, and he was merely present at the scene of a crime, which does not establish probable cause. [*Id.* at 8-9].

Next, Mitchell argues that the impound and inventorying of the Chrysler were improper, first, because there was no probable cause, and second, it was on private property (the PDK airport) and not on public property. [*Id* at 10-12]. He also argues that neither he nor the passenger were given the opportunity to have someone come retrieve the vehicle rather than have it impounded. [*Id.* at 12]. He finally argues that the Government's argument that reasonable suspicion supported his detention is a ruse to detract from his unconstitutional arrest. [*Id.* at 12-13].

34

b.      **Applicable Standards**

The Government bears the burden to demonstrate the legality of a warrantless arrest. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *Tobin*, 923 F.2d at 1521 & n.21. A warrantless arrest is constitutionally valid only when there is probable cause to arrest. *See United States v. Watson*, 423 U.S. 411, 417 (1976); *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982). Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992); *United States v. Allison,* 953 F.2d 1346, 1350 (11th Cir. 1992) (holding that the time period relevant to the inquiry is the moment the arrest was made).

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). In determining whether probable cause exists, courts " 'deal with probabilities . . . [which] are the factual and practical

35

considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates,* 462 U.S. 213, 229-31 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). That is, probable cause " 'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.' " *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (quoting *Wilson v. Attaway*, 757 F.2d 1227, 1236 (11th Cir. 1985)).

A determination of probable cause must be made by considering the "totality of the circumstances." *Gates*, 462 U.S. at 233; *United States v. Lyons*, 403 F.3d 1248, 1253 (11th Cir. 2005). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*,  540 U.S. 366, 371 (2003) (internal punctuation marks and citations omitted).

In general, association with a known drug dealer, without more, is insufficient to establish probable cause. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *United States v. Di Re*, 332 U.S. 581, 593 (1948) (mere presence at the

36

scene of a crime is not probable cause for a warrantless arrest); *Virden*, 488 F.3d at 1322.   At the same time, however, an officer is not required to resolve all inferences and all factual conflicts in favor of the suspect.  An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect.  *Bailey v. Board of County Comm'rs of Alachua County, Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v. Pantoja-Soto*, 739 F.2d 1520 (11th Cir. 1984).

Officers may rely on information received from an "identified bystander or victim-eyewitness to a crime."  *United States v. Martin*, 615 F.2d 318, 325 n.9 (5th Cir. 1980) (quoting *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972)).[26] Such persons are deemed generally reliable because they "are not 'intimately involved with the persons informed upon and with the illegal conduct at hand' as other informants often are."  *Id*.  Moreover, when a group of officers is conducting

_____

[26] Error! Main Document Only. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause. *United States v. Goddard*, 312 F.3d 1360, 1362 (11th Cir. 2002); *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1992); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984). The observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause for an arrest. *Gonzalez*, 969 F.2d at 1003.

In determining whether probable causes existed to support the arrest, a court's focus must be not upon each fact in isolation but " 'the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers.' " *Wilson*, 894 F.2d at 1254 (quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977), and *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966)). To determine whether an officer had probable cause to arrest an individual, the court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). That is, probable cause is judged using an objective standard, *United*

*States v. Street*, 472 F.3d 1298, 1305 (11th Cir. 2006); subjective beliefs of the officers "play no role in the ordinary probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 817 (1996).

Probable cause existed when Mitchell was arrested following the stop of the Chrysler.  These facts support probable cause:  By the time Davis's April 2018 flight from California landed at PDK, law enforcement already knew that Davis had chartered at least one private plane to fly a large quantity of marijuana from California to Georgia.  Based on the December 2017 arrests and seizures and the monitoring of the Compound, the airport in Sacramento, and Davis's social media postings, law enforcement knew that Davis operated a substantial marijuana business that was supplied from northern California; he was observed on the tour bus trip to California with a very large amount of cash; both the December 2017 seizure and the April 2018 surveillance showed that the rectangular-shaped marijuana packages were covered by wrapping paper and loaded onto charter planes; Davis and his organization utilized private chartered planes that landed at relatively small airports before sunrise; the operation involved using a number of persons, including the planes' passengers, to load and unload the marijuana packages onto and off of the planes; Davis and his coconspirators rejected

39

professional ground crew assistance, which according to the PDK FBO supervisor was very unusual; several vehicles were utilized to take the planes' passengers and marijuana cargo away from Charlie Brown Airport in December 2017; and the Chrysler and Econoline van in April 2018 left Davis's compound in tandem and arrived at PDK airport and drove over to the arriving plane, likely repeating the unloading and exit procedures.

The Court rejects Mitchell's argument that he was merely present at the wrong place at the wrong time. By the time Mitchell was apprehended, probable cause existed that Davis transported another planeload containing a large amount of marijuana from California to Georgia on April 14; the vehicle in which Mitchell ultimately was found left the Compound before dawn and in tandem with the Econoline van and arrived at PDK; the Chrysler and the van left the Compound and arrived at PDK even though towards the end of the flight, the plane's destination airport changed, thus indicated communication between the marijuana-ladened plane and drivers of the vehicles; the Econoline van was positioned to retrieve the packages in the plane's cargo hold, which packages were wrapped similarly to the marijuana seized in December 2017; personal luggage was offloaded from the

40

plane and placed in the Chrysler; and one of the passengers from the plane got into the Chrysler which then began to leave the airport as it was stopped.

The critical facts that differentiate his situation from other merely-present cases. For example, in *Virden*, the police were readying to execute search warrants on several properties in a drug investigation. Virden was seen driving away from one of the locations; he pulled into a gas station and went into the store to make purchases, and upon exiting was stopped by police. He stated that he had left a girl's residence on a different street but was unfamiliar with the neighborhood as he was out of town. He was driving a rental car and neither he nor the vehicle were known to the investigation. He ultimately was placed in the back of a police car, and he and his vehicle were transported to another location, where at first a drug dog alerted to the vehicle and then drugs were found in its trunk. *Virden*, 488 F.3d at 1320. The Eleventh Circuit held that Virden was arrested when he and his vehicle were transported to another location and the arrest was not supported by probable cause, concluding that his leaving a known drug location, having apparent control over that location's garage door, and his misstatements as to his travels did not amount to probable cause. *Id.* at 1322. There was no showing prior to Virden's arrest that he assisted in any drug-related conspiracy. On the other

41

hand, by leaving the Compound and arriving at PDK to pick up at least one passenger and the personal luggage from the plane, Mitchell facilitated the removal of the coconspirators and their personal belongings from the scene.   Given the exclusion of FBO personnel from tending to the aircraft or unloading the plane, it is highly unlikely that the conspirators would have allowed a mere bystander near the marijuana-reeking plane.   *Cf. United States v. Ashcroft*, 607 F.2d 1167, 1171 (5th Cir. 1979) ( finding probable cause to arrest defendant despite his claim of mere presence, noting that "a drug sale involving large quantities of cocaine is a private transaction that does not usually occur in the open or in the presence of strangers").

Similarly, in *United States v. Pintado*, 715 F.2d 1501 (11th Cir. 1983), law enforcement surveilling a marijuana-offloading operation in the middle of the night saw about six individuals carrying large bundles from a boat to a house.   Two offloaders were arrested outside the house while others ran inside upon the police announcing their presence.   A total of seven persons were arrested, included Pintado, who was located in a locked closet upstairs in the house, and he was wearing pants and maybe a shirt.   Police located a number of wet, damp, and dirty clothes on the first floor of the house.   *Id.* at 1502-03.   The Eleventh Circuit found the evidence of Pintado's joinder in the conspiracy insufficient:

42

The government provided no evidentiary basis other than appellant's presence in the house, hiding in the closet, from which an inference of conspiratorial participation could be drawn.

Even though the testimony showed that appellant was clothed in pants and a shirt, . . . and from this the jury reasonably could reject defense counsel's argument that appellant had been sleeping in the bedroom at the time the customs officials entered the house, presence in the house, awake or asleep, without more, does not provide a sufficient basis to infer participation or agreement. There are no objective facts or circumstances from which appellant's knowledge of the ongoing operation could be inferred. . . . Government witnesses testified that the off-loading operation was conducted almost silently, the garage in which the marijuana was found was not visible from within the house where appellant was discovered, and the government provided no connection between the marijuana and the appellant other than his clothed, hidden presence in the house. Several sets of damp, dirty clothing were found in the house. The clothing was in no way tied to the appellant either through evidence that the number of sets of clothing coincided with the number of arrestees or indictees or that the size of any set of clothing was compatible with appellant's clothing size.

*Id.* at 1505 (internal citation and footnote omitted). Contrary to Mitchell's situation, there was no evidence that Pintado did anything to further the drug conspiracy's objectives and, thus, no evidence that he knowingly joined the conspiracy.

Somewhat closer to the present case's facts is *United States v. Kelly*, 749 F.2d 1541, 1548-49 (11th Cir. 1985), where the court found the evidence insufficient as to one defendant. In *Kelly*, the defendant (Garcia) inspected the boat

of the lead defendant (which boat was used to smuggle controlled substances) for seaworthiness, was present at a meeting at the shipowner's residence where other co-conspirators were present, and he was present in a vehicle with another coconspirator near the driveway of the shipowner's house at the time that law enforcement raided the boat.  The Eleventh Circuit held that unlike the other conspirators who were unloading the boat, there was no evidence that the drug conspiracy was discussed in Garcia's presence at the meeting at the shipowner's house, and his "presence in the car in the early hours . . .  is mere presence." *Id.* at 1549.  Nonetheless, while both Garcia and Mitchell engaged in otherwise innocent behavior, the present case is factually distinguished because the evidence demonstrates that the vehicle he ultimately was driving left in tandem from the Compound with the Econoline van (the "load" vehicle), went to PDK despite the last-minute change in itinerary, and Mitchell actively assisted in picking up passengers and luggage from the plane after it landed at PDK, just as the Sprinter van had done with passengers and luggage in December 2017.

Finally, there is more evidence supportive of probable cause in this case than that found in *United States v. DeSimone*, 660 F.2d 532 (5th Cir. Unit B 1982).  In *DeSimone*, the conspirators arranged for the landing of a marijuana-ladened DC-6

44

on a small airport airstrip near Greensboro, Alabama.  The Former Fifth Circuit noted that DeSimone checked into a motel in Tuscaloosa on June 7, 1979 and occupied one of the rooms registered to a nonexistent company, as were several other rooms at the motel which had been rented for cash and rented to coconspirators.  He was observed in the presence of several other defendants on the afternoon of June 11, 1979.  Finally, he was apprehended in the early morning hours of June 12, 1979 (the DC-6 had landed at 3:30 AM) in the vicinity of one of the cars rented by a coconspirator, presumably having fled from that vehicle along with three other defendants.  (His fingerprint was lifted from the trunk of another one of the rented cars.)  The *DeSimone* court found the combined circumstances of DeSimone's association with his co-defendants at various times over a period of several days and his attempted flight in the middle of the night from an automobile which was ditched near the Greensboro airport, a remote area, as certainly arousing suspicion, but did not prove beyond a reasonable doubt that he conspired to import and distribute marijuana.  *Id.* at 535-36, 537.  Contrary to the sparse evidence of DeSimone's affirmative actions in furtherance of the conspiratorial goals, in this

case Mitchell assisted in effectuating the coordinated plan to transport the co-conspirators and their belongings from PDK.[27]

For all of these reasons, the undersigned concludes that Mitchell was lawfully arrested.

The Government contends that the Chrysler was properly searched pursuant to the ATF's impound and inventory procedures. "The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The Supreme Court has held that

_____

[27]     *United States v. Willis*, 759 F.2d 1486 (11th Cir. 1985), relied upon by the Government, is only somewhat helpful. While the Government analogizes Mitchell to the *Willis* opinion's discussion of the need for additional coconspirators to arrive on the scene to unload a drug-filled plane, *Willis*, 759 F.2d at 1496-97, *Willis* is distinguishable from the present case. First, there was more evidence in *Willis* of the defendant's culpability, since Willis exhibited mens rea by immediately leaving the airport upon seeing police surround the drug plane. *Willis* also is different than this case because the issue there was whether the police had reasonable suspicion to detain him, *id.*, whereas here, the issue is whether Mitchell's arrest is based on probable cause.

In this regard, the Court rejects the Government's alternative argument that reasonable suspicion supported Mitchell's detention and, then ripened into probable cause for his arrest when the marijuana was discovered in the cargo hold of the plane. There already was probable cause to arrest Mitchell based on the probability that the plane was transporting marijuana and Mitchell (as an occupant of the Chrysler) arrived at the airport from the Compound, having departed that location in tandem with the van needed to remove the marijuana from the airport.

46

inventory searches, conducted pursuant to an established procedure, but without a warrant, on legally impounded vehicles are valid under the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976).  After lawfully taking custody of a vehicle, law enforcement officers may conduct an inventory search of the vehicle in order to protect the owner's property while it is in police custody, to protect the police from claims of lost or stolen property, and to protect the police from potential danger.  *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987).   An inventory search permits a thorough search of property lawfully in police custody, as long as that search is consistent with the police caretaking function.  *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985).  In this context, "the legitimacy of the search . . . turns on its reasonableness in light of the community caretaking functions that allow inventory searches. . . .  [T]he reasonableness of the inventory search depends on the particular facts and circumstances."  *United States v. Laing*, 708 F.2d 1568, 1571 (11th Cir. 1983) (internal citation omitted). A warrantless inventory search of an automobile made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents" is a reasonable police intrusion that does not offend Fourth Amendment principles. *Opperman*, 428 U.S. at 372-73.

47

As noted, an inventory search must be conducted according to standardized criteria.  *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *United States v. Johnson*, 777 F.3d 1270, 1277 (11th Cir. 2015) ("a police officer may only 'impound a vehicle so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity' ") (quoting *Sammons v. Taylor*, 967 F.2d 1533, 1541 (11th Cir. 1992)). "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."  *Wells*, 495 U.S. at 4; *see also Bertine*, 479 U.S. at 372 (approving an inventory search where there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation").  *Cf. Whren*, 517 U.S. at 811-12 (finding that pretext will not invalidate an investigatory stop so long as there was probable cause, but acknowledging that, in the context of an inventory search, an officer's improper motive invalidates objectively justifiable behavior); *see also United States v. Khoury*, 901 F.2d 948, 959 (11th Cir.) (finding that officer's search had no purpose other than investigation and stating, "such a warrantless investigatory search may not be conducted under the guise of an inventory"), *modified on other grounds*, 910 F.2d 713 (11th Cir. 1990).  The established procedure, however, need not be

48

detailed.  *Johnson*, 777 F.3d at 1277, and the Eleventh Circuit has upheld an inventory search where the district court had indicated that a police department's policy " 'permitted impoundment under the circumstances' and 'the defendant had not countered th[e] assertion.' "  *Id.*  The Government has the burden to show the requirements of an inventory search have been met.  *Sammons*, 967 F.2d at 1543 (citation omitted).

The ATF inventory procedure invoked in this case provides as follows:

 An inventory search will be conducted on all conveyances taken into custody.

The interior areas of the vehicle, including all compartments and containers, whether locked or sealed, will be opened, and all personal effects will be removed and inventoried on an ATF F 3400.23 before the conveyance is turned over to the USMS or sub-custodial agency. Return all personal effects to the defendant or his/her designee as soon as feasible.  Copies of all documentation will be placed in the investigative file and scanned and uploaded to the N-Force "Source Folder."

All contraband *per se*, all items subject to forfeiture, and all items of evidentiary value discovered during the course of an inventory search shall be handled as prescribed in this manual.

When a special agent seizes an aircraft or boat, the logbooks and any other records relating to the operation and maintenance of the aircraft/boat will also be seized.

49

When processing a conveyance, the special agent shall enter the make, model, year, VEN, license plate, color, and mileage in N-Force. Prior to transfer to USMS, the conveyance's condition (including damage) will be photographed and documented on the appropriate subcontractor form.

If an asset will be physically stored with ATF or a State/local law enforcement agency for anticipated official use or equitable sharing, a sub-custodial agreement must be in place. Contact the FAST for assistance.

If a conveyance is desired for official use or equitable sharing, the agent shall coordinate with the FAST to submit documentation to AFSPD.

March 8, 2019 Govt. Ex. 5. Thus, the Government has established that the Chrysler was subject to impound pursuant to a standardized policy and during the subsequent inventory, the firearm was found in the Chrysler.

The Court rejects Mitchell's first complaint that probable cause is necessary to conduct an impound of a vehicle. Probable cause is not required to conduct a valid inventory search. *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983); *see also United States v. Mitchell*, No. 3:11-CR-248(S1)-J-34, 2013 WL 3808152, at *5 (M.D. Fla. July 22, 2013) (holding that when police impound a vehicle pursuant to their community care-taking function, probable cause is not required). *Cf. United States v. Forget*, No. 20-10585, 2021 WL 1626499, at *5 (11th Cir. Apr. 27, 2021)

50

("Inventory searches of an arrestee's personal property are a 'well-defined exception' to the warrant requirement.").

Second, the Court rejects Mitchell's next argument that the Chrysler was located on private property and thus not subject to impound and inventory. The vehicle was not on Mitchell's private property but that of a third-party commercial entity. *United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990) (finding it was not unreasonable to impound and inventory a vehicle, even though it was parked in a parking lot of a private corporation, where the driver was arrested and no one was present to take custody of the vehicle); *United States v. Baskin*, No. 1:14-CR-293-TCB-AJB, 2016 WL 5334754, at *3 (N.D. Ga. Sept. 23, 2016) (rejecting private-property argument against impound by holding that "Baskin's vehicle was impounded and searched because Baskin was arrested, there was no other person to retrieve the vehicle, and the vehicle was not on Baskin's residence or property, which was in accordance with the department's policies . . .").

Third, as to Mitchell's complaint that the impound was unlawful because the authorities did not give him an opportunity to call someone to retrieve the Chrysler, there is no evidence that Mitchell requested such an accommodation, nor is there evidence that any such request was denied. In any event, Eleventh Circuit

51

precedent forecloses Mitchell's contention that the impound and inventory search were unlawful because the agents did not secure other individuals to retrieve the vehicle:

> While giving [defendant] an opportunity to make alternative arrangements would undoubtedly have been possible, we said in *Lafayette*[, 462 U.S. at 647-48]: . . . "The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive means.'" We conclude that here, as in *Lafayette*, reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.

*Sammons*, 967 F.2d at 1540 (quoting Bertine, 479 U.S. at 373-74) (quotation marks altered).

Finally, the inventory search was not a pretext for the Government's unlawful arrest because, as discussed above, the arrest was lawful.

As a result, the undersigned **RECOMMENDS** that Mitchell's motion to suppress, [Doc. 242], be **DENIED**.

### 4.    Ott's June 2018 arrest

Ott was arrested on June 19, 2018 when the vehicle in which he was traveling was stopped and the outstanding federal and state arrest warrants were executed

upon him.  T2:34-35; [Doc. 246].  A firearm was located on his person.  T2:38.

The arrest warrants authorized the stop of the car and Ott's arrest.  *Steagald v.*

*United States*, 451 U.S. 204, 213, 214 n.7 (1981) (recognizing that an arrest warrant

authorizes the police to seize a person and deprive him of his liberty); *United States*

*v. Cortez*, 449 U.S. 411, 417 n.2 (1981) ("an officer may stop and question a person

if there are reasonable grounds to believe that person is wanted for past criminal

conduct."); *United States v. Cotton*, 721 F.2d 350, 351 (11th Cir.1983) (reasonable

suspicion justified stop of vehicle due to either that criminal activity was afoot or

that defendant, for whom there was an outstanding arrest warrant, was in the

vehicle)); *United States v. Dooley*, No. 2:09-CR-00016-WCO, 2011 WL 2162687,

at *2 (N.D. Ga. June 2, 2011) ("[Be]cause law enforcement officers in this case

knew of defendant's outstanding arrest warrant and knew that criminal activity was

in progress so long as defendant remained a fugitive, they could lawfully stop his

vehicle.") (citing *Cotton*, 721 F.2d at 351); *United States v. Provens*, No. 5:09-CR-

53-KOB-TMP, 2009 WL 10695199, at *3 (N.D. Ala. June 25, 2009) ("Little

authority is required to support the conclusion that police may conduct a traffic stop

for the purpose of executing an arrest warrant for someone in the car.") (citations

omitted), *report and recommendation adopted*, No. 5:09-CR-53-KOB-TMP,

2009 WL 10695232 (N.D. Ala. Aug. 5, 2009); *see also United States v. Rosario*, 305 Fed. Appx. 882, 885 (3d Cir. Jan. 15, 2009) ("[T]he Government established probable cause to stop the vehicle to execute the . . . arrest warrant."); *United States v. Helton*, 232 Fed. Appx. 747, 749 (10th Cir. Apr. 9, 2007) (traffic stop was a reasonable investigative stop for purposes of executing an arrest warrant, even though passenger in car turned out not to be subject of warrant); *cf. Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002) (no violation of the Fourth Amendment where mistaken identity led to arrest of wrong person under valid warrant). The subsequent warrantless search of Ott's person, leading to the discovery of the firearm, was entirely justifiable as a search incident to a valid arrest. *See Chimel v. California*, 395 U.S. 752, 763 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or to effect his escape. . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."); *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir. 1987) ("A search incident to arrest is always allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence.").

54

Therefore, Ott's arrest and search of his person and discovery of the firearm were lawful, and as a result, the undersigned **RECOMMENDS** that his motion to suppress as to this incident, [Doc. 365], be **DENIED**.

## II.   **REMAINING MOTIONS**

### 1.   **Motions for Bill of Particulars**

Defendants Potts, [Doc. 215], Mitchell, [Doc. 241], and Bridges, [Doc. 511], seek a bill of particulars.

The standards for evaluating motions for a bill of particulars are well known. Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.  Rule 7(f) authorizes the Court to direct the Government to file a bill of particulars.  The grant or denial of a bill of particulars rests within the sound discretion of the trial court.  *United States v. Draine*, 811 F.2d 1419, 1421 (11th Cir. 1987).  A defendant bears the burden of showing that the information requested is necessary and that he or she will be prejudiced without it so as to justify granting a bill of particulars.  *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998).  A mere statement that the defendant will be prejudiced without the bill is insufficient. *See id.*

The purpose of a true bill of particulars is threefold: "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985) (citations omitted).   A bill of particulars, properly viewed, supplements an indictment by providing the defendant with information *necessary* for trial preparation.   *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (italics in original).   Generalized discovery, however, is not an appropriate function of a bill of particulars and is not a proper purpose in seeking the bill.   *Id.* at 1442; *United States v. Colson,* 662 F.2d 1389, 1391 (11th Cir. 1981).   Similarly, the Eleventh Circuit has held that a bill of particulars should not "automatically [be] accorded the status of a supplement to an indictment."   *Anderson*, 799 F.2d at 1442.

Furthermore, a defendant is not entitled to a bill of particulars "with respect to information which is already available through other sources."   *United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990); *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.), *modified on other grounds,* 801 F.2d 378 (11th Cir. 1986).   A bill of particulars may be obtained to clarify an indictment, as long as it

does not seek to determine in advance the Government's proof.  *United States v. Johnson*, 575 F.2d 1347, 1356 (5th Cir. 1978); *United States v. Smith*, 341 F. Supp. 687, 690 (N.D. Ga. 1972).  However, the fact that an indictment conforms to the simple form suggested by the Federal Rules of Criminal Procedure, or accurately tracks the statutory or regulatory language, is no answer or defense to a motion for a bill of particulars, since Rule 7(f) presupposes a valid indictment or charge against the defendant.  *See United States v. Carrier*, 672 F.2d 300, 303 (2d. Cir. 1982) ("A bill of particulars may not save an invalid indictment[.]").  Instead, it is proper for a defendant to be furnished with further information regarding the charge when it is necessary for preparation of his defense and even though the granting of the motion requires the supplying of information "which in other circumstances would not be required because evidentiary in nature." *United States v. Smith*, 16 F.R.D. 372, 375 (W.D. Mo. 1954); *Carrier*, *supra* ("[A bill of particulars] may provide the defendant with the evidentiary details needed to establish his defense.").  Even if in providing those details in a bill of particulars, the Government's evidence or theories are somehow disclosed, the bill of particulars might be still proper. *United States v. Thevis*, 474 F. Supp. 117, 123 (N.D. Ga. 1979); *Smith*, 16 F.R.D. at 375; Wright, *Federal Practice and Procedure*

57

*Criminal 2d* § 129.  Finally, opposition to a bill of particulars is not properly made out by a claim that the defendant " 'knows what he did, and, therefore, has all the information necessary.' "  *United States v. Moore*, 57 F.R.D. 640, 643 (N.D. Ga. 1972) (quoting *Smith*, *id*.).

Defendants' motions are denied.  Potts's motion itself details that the discovery reflects that she traveled on a privately chartered plane with several codefendants from McClellan Airport in Sacramento, California to PDK Airport, and the plane carried 17 wrapped packages containing over 440 pounds of marijuana.  [Doc. 215 at 2-3].  She seeks the particulars of when she joined the conspiracy, but her description of her involvement as shown by the discovery renders unnecessary further elucidation of the conspiracy count in which she is named.  *Cf. United States v. Al-Arian*, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) (holding that while bill of particulars was appropriate to identify unindicted co-conspirators, it was not appropriate to identify details regarding when a defendant joined conspiracy, particularly where overt acts were clearly identified in indictment); *see also United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *14-15 (N.D. Ga. June 12, 2007) (denying motion for bill of particulars where government represented that it had provided extensive discovery

58

materials to defendant responsive to the requests made and that information "sufficiently advise[d] [d]efendant of the specific conduct for which [he] is being prosecuted"). The indictment itself identifies who whom she conspired, and the Court's standard pretrial order requires the Government to disclose all unindicted coconspirators, and, therefore, she is not entitled to a bill as to that information. She likewise is not entitled to a bill as to the specific criminal conduct in which she allegedly she engaged. "An indictment for conspiracy to commit an offense is not required to be as specific as a substantive count and is constitutionally asserted if it sets forth the essential elements of the offense, identifies co-conspirators, the object of the conspiracy, the conspiracy timeframe, and the situs of the conspiracy." *United States v. Durrett*, No. 1:10-cr-134-WSD, 2012 WL 243761, at *4 (N.D. Ga. Jan. 25, 2012) (citation omitted), *aff'd* 524 Fed. Appx. 492 (11th Cir. July 25, 2013). She is in effect seeking discovery of the evidence against her. *United States v. Scrushy*, No. CR-03-BE-530-S, 2004 WL 483264, at *9 n. 5 (N.D. Ala. Mar. 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge. The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law. It is not to eliminate

59

surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original).  She also is not entitled to a bill of particulars as to the money or property obtained as a result of her involvement in any conspiracy charged.  *United States v. Green*, No. 1:16-CR-145-TWT-JKL, 2017 WL 10403354, *2 (N.D. Ga. Oct. 5, 2017) (denying motion for bill of particulars seeking information as to whether defendant was enriched through criminal conduct, and, if so, how much money did he receive, and whether defendant provided financial assistance to gang members); *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1446 (S.D.N.Y. 1989) (denying motion for bill of particulars seeking, inter alia, information an accounting of the amount by which the defendant was enriched by the alleged conspiracy).

As a result, Potts's motion for a bill of particulars is **DENIED**.

Mitchell's motion fares no better.  His request for a bill as to when, with whom, and how he joined the conspiracy are denied for the same reasons Potts's motion was denied.  As to the firearm attributed to him in Counts Five and Six of the superseding indictment, the Government responds that the indictment details the make and model of the firearm attributed to him (a Springfield Armory, XD-9, 9mm pistol), and the discovery identifies where each firearm in the Chrysler was

60

located in relation to each defendant.  [Doc. 390 at 3-4 (citing [Doc. 287 at 4-5)]].

Thus, Mitchell's motion for a bill of particulars is **DENIED**.

Bridges's motion for a bill of particulars likewise seeks when he joined the

conspiracy, with whom he conspired, what specific criminal conduct he committed,

and what benefit he derived.  [Doc. 511 at 2-3].  These requests are denied for the

same reasons as discussed in relation to Potts's and Mitchell's motions.  Bridges's

motion for a bill of particulars therefore is **DENIED**.

In conclusion, the motions for a bill of particulars, [Docs. 215, 241, 511], are

**DENIED**.

### 2.      Brenton Mitchell's motion to strike alias

Mitchell moves to strike the alias of "O.G." from the indictment, alleging

that the moniker stands for "Original Gangster" and arguing that it frequently is

used by criminal gangs to denote someone who has achieved elevated status due to

the performance of criminal and sometimes violent actions.  [Doc. 371 at 1].   He

alleges that using this alias prejudices him because it is not necessary to identify

him through that moniker and that this case only pertains to a marijuana conspiracy

and possession of firearms.   [*Id.* at 2].   The Government contends that that

identification is exactly the purpose of the alias in this case, and that it "will

introduce evidence of Defendant's alias and the use of that alias will be necessary to identify [him] in connection with the acts charged in the first superseding indictment." [Doc. 391 at 2-3].

" 'The use of an alias in an indictment and in evidence is permissible if it is necessary to connect the defendants with the acts charged.' " *United States v. Alindor*, 799 Fed. Appx. 678, 683 (11th Cir. Jan. 13, 2020) (quoting *United States v. Hines*, 955 F.2d 1449, 1454 (11th Cir. 1992) (quotation marks omitted)); *see also United States v. Harriston,* 329 F.3d 779, 792 (11th Cir. 2003) ("If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted.").

In this case, the Government has represented that the use of the alias "O.G." is necessary to identify Mitchell in connection with the acts with which he is charged.  The Court also notes that while Defendant alleges prejudice due to what he describes as the meaning of the alias, it is not obvious that the moniker "O.G." only refers to the description alleged by Defendant, thus minimizing the potential of prejudice at trial.  For example, in *United States v. Johnson*, 730 Fed. Appx. 895,

62

896 (11th Cir. July 13, 2018), the defendant's alias was "O.G.", which meant in that case "Old Girl."  The court held that no error was demonstrated in the trial court's refusal to strike the alias because a  witness testified at trial that he had only known the defendant as "O.G." and had not previously known her real name, and his girlfriend's phone expressly had listed Johnson as such.  Thus, the reference to "O.G." in this case might not be as prejudicial as Defendant makes it out to be. Even if he had demonstrated some undue prejudice, he has not demonstrated that the District Judge could not blunt the potential prejudice, for example, by limiting the Government to introducing evidence that Mitchell was known as "O.G." without allowing evidence as to what the moniker meant.

As a result, the motion to strike, [Doc. 371], is **DENIED**.

### 3.      Mitchell's motion to dismiss Count Six

In this motion, Mitchell alleges that charging him with possession of a firearm while under indictment for other felony offenses, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D), violates his rights under the Second Amendment in light of *District of Columbia v. Heller*, 554 U.S. 570 (2008). [Doc. 372].   The Government responds that on September 8, 2010, Mitchell pleaded guilty to criminal attempt, aggravated assault and possession of a knife

63

during the commission of a crime in the Douglas County (Ga.) Superior Court, and was sentenced by the Superior Court under the Georgia First Offender Act to 20 years concurrently for the attempt and aggravated assault and five years consecutive for possession of the knife, and that after five years, the remainder of the sentence was to be served on probation. [Doc. 389-1]. It contends that other courts have concluded that a First Offender sentence qualifies as a triggering event under § 922(n) but otherwise the Government's response is directed solely to an argument that Mitchell did not make, that is, that § 922(n) is vague. [*See* Doc. 389 *passim*]. Despite the Government's response, Mitchell did not file a reply. (*See* Dkt.).

Nonetheless, the Court has been directed to no case that holds § 922(n) violative of the Second Amendment in light of *Heller* and, in fact, all of the cases that have considered the issue have found that § 922(n)'s proscription survives *Heller*. *United States v. Khatib*, No. 12-CR-190, 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012) (concluding that temporarily prohibiting a demonstrably dangerous individual under indictment from acquiring a firearm substantially serves the important government objective of ensuring public safety and thus, as applied to defendant, § 922(n) comports with the Second Amendment), *report and*

64

*recommendation adopted*, No. 12-CR-190, 2012 WL 6707199 (E.D. Wis. Dec. 26, 2012); *United States v. Call*, 874 F. Supp. 2d 969, 975-79 (D. Nev. 2012); *United States v. Laurent*, 861 F. Supp. 2d 71, 100-05 (E.D.N.Y. 2011). The Court also notes that in *United States v. Rivero*, 218 Fed. Appx. 958 (11th Cir. Feb. 28, 2007), the court held that § 922(n) did not violate the Second Amendment's right to bear arms, but the Court also recognizes that *Rivero* predates *Heller* and is an unpublished decision, which makes the decision persuasive but not binding precedent.

It is not clear whether Mitchell is bringing a facial or as-applied challenge in this motion or both. An as-applied challenge to the constitutionality of a statute generally cannot be raised in a pretrial motion to dismiss, since it necessary involves an examination of the facts of the case. *See United States v. Pope*, 613 F.3d 1255, 1260-61 (10th Cir. 2010) (ruling that district court was unable to properly resolve defendant's pretrial motion to dismiss indictment where defendant claimed that his charge under 18 U.S.C. § 922(g)(9) was unconstitutional under Second Amendment because he possessed guns only for defense of self, family, and property). As for a facial challenge, the Court is convinced that, like the court in *Laurent*, application of intermediate scrutiny of an impingement on Mitchell's

65

Second Amendment rights withstands *Heller* scrutiny.  That is, the Government has a substantial interest in keeping persons like Mitchell, under indictment for violent offenses such as aggravated assault and possession of a knife during the commission of a crime from temporarily possessing firearms during the pendency of those charges.

As a result, the undersigned **RECOMMENDS** that Mitchell's motion to dismiss Count Six, [Doc. 372], be **DENIED**.

### 4.      Bridges's motion to dismiss indictment for lack of venue

In this motion, Bridges contends that he did not engage in any act in the Northern District of Georgia and thus venue is improper as to him in this District. [Doc. 511].

"It is by now well-settled that venue is an essential element of the government's proof at trial.  'Questions of venue . . . are not to be taken lightly or treated as mere technicalities. . . .' " *United States v. Snipes*, 611 F.3d 855, 865-66 (11th Cir. 2010) (citation omitted).  Rule 18 of the Federal Rules of Criminal Procedure as well as the U.S. Constitution and the Sixth Amendment " 'guarantee defendants the right to be tried in the district in which the crime was committed.' " *Id.* at 866 (citation omitted); *see also United States v. Shoss*, 523 Fed. Appx. 713,

715 (11ᵗʰ Cir. July 24, 2013) (same).  "The locality of the crime is 'determined from the nature of the crime alleged and the location of the act or acts constituting it.' " *Shoss*, 523 Fed. Appx. at 715 (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998) (quotation marks omitted)).

However, in ruling on Bridges's motion to dismiss, the Court cannot address his contentions that the Government is unable to prove venue.  The Court is limited to determining whether the Government's allegation that a defendant committed the offenses in the Northern District of Georgia "and elsewhere" is sufficient. *United States v. Williams*, No. 1:10-CR-150-TCB-AJB, 2010 WL 3488131, at *4 (N.D. Ga. Aug. 2, 2010), *report and recommendation adopted,* No. 1:10-CR-150-TCB, 2010 WL 3488130 (N.D. Ga. Aug. 30, 2010).  "By now it has become well-established that '[t]he sufficiency of a criminal indictment is determined from its face.' . . . 'For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.' . . . 'An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute.' " *United States v. Sharpe*, 438 F.3d 1257, 1263 (11ᵗʰ Cir. 2006) (citations omitted).  In this regard, "an

indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense. . . .  An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime." *Cole*, 755 F.2d at 759.

In resolving a defendant's pretrial motion to dismiss, the court is not determining whether the Government's evidence is sufficient to find that venue is proper in this District - such a determination is left to the trial jury. *See Snipes*, 611 F.3d at 866 ("a jury must decide whether the venue was proper"); *Sharpe*, 438 F.3d at 1263 ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the *language used* to charge the crimes. . . .  It is well-settled that 'a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.' ") (citations omitted; emphasis in original); *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) ("There is no summary judgment procedure in criminal cases.  Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. . . .  The sufficiency of a criminal indictment is determined from its face.").  These considerations apply equally to a

68

facially sufficient indictment, such as returned by the properly constituted grand jury in this case, that pleads that the offenses occurred in the Northern District of Georgia. *See Williams*, 2010 WL 3488131, at *4 ("An indictment need not specify the exact location of the offense, but rather must be sufficiently specific to allege that the crime was committed within the jurisdiction of the court.").

In *Snipes*, the court noted that "the grand jury returned a facially sufficient indictment, with a clear statement of venue." *Snipes*, 611 F.3d at 866. Such an indictment, "if valid on its face, is enough to call for trial of the charge on the merits." *Id.* The court further held that it would not have been appropriate for the court to make a finding on any pretrial consideration of the facts. *Id.*; *see also United States v. Valencia-Munoz*, Criminal Action No. 1:09-CR-025-TCB-CCH-8, 2010 WL 4962972, at *2-3 (N.D. Ga. Oct. 26, 2010), *report and recommendation adopted at* 2010 WL 4965873 (N.D. Ga. Dec. 1, 2010); *Williams*, 2010 WL 3488131, at *3-4.

The same is true in this case. Counts One and Three allege that the charged offenses occurred "in the Northern District of Georgia and elsewhere[.]" [Doc. 287 at 1, 2]. Venue is sufficiently alleged. *See Williams*, 2010 WL 3488131,

69

at *4 (holding that because the indictment alleges that the offenses occurred within the Northern District of Georgia, "the indictment [wa]s properly pleaded.").

Accordingly, the undersigned **RECOMMENDS** that the motion to dismiss for improper venue, [Doc. 511], be **DENIED**.

### 5.      Bridges's motion and supplement to motion for severance

In these motions, [Docs. 513, 584], Bridges argues that he is entitled to severance both on the grounds that venue is improper, prejudicial spillover from the amount of evidence against his codefendants, and, since he did not step foot in this District, any evidence against him must have come from codefendants and therefore he in entitled to separate trial under *Bruton v. United States*, 391 U.S. 123 (1968). [Docs. 513, 584].

The Court already has addressed Bridges's improper venue motion and, as a result, he is not entitled to severance on that ground.

Second, Rule 14(a) of the Federal Rules of Criminal Procedure allows for severance if joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). However, "there is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir.

70

2011); *see also United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985) ("The general rule in [the Eleventh Circuit] is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases."). "Joint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *Lopez*, 649 F.3d at 1233-34; *Zafiro*, 506 U.S. at 537. Rule 14(a) requires "a [district] court to balance the rights of the defendant[ ] and the government to a trial that is free from the prejudice" against the public interest in judicial economy. *United States v. Novaton*, 271 F.3d 968, 989 (11th Cir. 2001) (quotation omitted) (reviewing the denial of a codefendant's severance motion).

A severance under Rule 14 should be granted only if the defendant can demonstrate that a joint trial would result in specific and compelling prejudice to the conduct of his defense. *United States v. Marszalkowski*, 669 F.2d 655 (11th Cir. 1982). The test for compelling prejudice is "whether under all the circumstances of a particular case, as a practical matter, it is within the capacity of the jury to follow the [instructions] and accordingly . . . appraise the independent

71

evidence against each defendant's own acts, statements and conduct." *United States v. Kabbaby*, 672 F.2d 857 (11th Cir. 1982). Conclusory allegations do not satisfy the defendant's burden, since courts presume that jurors can compartmentalize evidence by respecting limiting instructions specifying what evidence may be considered against what defendant. *United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) (citing *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997)); *see also United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (in affirming denial of severance motion asserting grounds that codefendant might testify for defendant, holding that severance not necessary upon defendant's "generalized vague and speculative assertions").

In satisfying the defendant's burden, it is not enough for him to show that acquittal would be more likely if he was tried separately, since some degree of bias is inherent in a joint trial. *Alvarez*, 755 F.2d at 857 (citing *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983), and *Marszalkowski*, 669 F.2d at 660). Furthermore, a defendant does not suffer "compelling prejudice" simply because much of the evidence at trial is applicable only to his codefendants. *Id.* (citing *United States v. Zielie*, 734 F.2d 1447, 1464 (11th Cir. 1984), and *United States v. Berkowitz*, 662 F.2d 1127, 1135 n.8 (5th Cir. Unit B 1981)); *see also United States*

*v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998) (same). Also, evidence of the reputation or past crimes of a codefendant does not ordinarily justify severance. *See United States v. Howell*, 664 F.2d 101, 106 (5th Cir. 1981); *United States v. Ocanas*, 628 F.2d 353, 359 (5th Cir. 1980); *United States v. Perez*, 489 F.2d 51, 67 (5th Cir. 1973), and cases cited therein.

Even if a defendant can show some prejudice, a defendant is entitled to severance only if that "prejudice flowing from a joint trial is clearly beyond the curative powers of precautionary instruction." *United States v. Morrow*, 537 F.2d 120, 126 (5th Cir. 1976); *Puiatti v. McNeil*, 626 F.3d 1283, 1310 (11th Cir. 2010) (recognizing that defendant seeking severance has a "heavy burden" of demonstrating compelling prejudice which occurs only where there is a serious risk that a joint trial (1) "would compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence.") (citations omitted); *see also United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993) (recognizing that a court errs in denying a severance motion if the denial "result[ed] in compelling prejudice against which [it] could offer no protection"). "Because limiting instructions usually will cure any prejudice resulting from a joint trial, . . . the Supreme Court has indicated that

73

severances need be granted only if there is a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given."   *Lopez*, 649 F.3d at 1234-35 (quoting *Zafiro*, 506 U.S. at 539).   "[E]ven in the case of prejudicial spillover, a court's cautionary instructions will ordinarily mitigate the potential spillover effect of evidence of a codefendant's guilt."   *United States v. Baradji*, 479 Fed. Appx. 301, 303 (11th Cir. July 9, 2012) (internal marks omitted) (quoting *Lopez*, 649 F.3d at 1235).

Finally, whether to grant a Rule 14 motion to sever involves an exercise of the court's considered discretion.   *United States v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992).

In this case, Bridges has not demonstrated either that the amount of evidence against his codefendants as compared to him, or the quality of evidence admissible only against his codefendants, will cause him specific and compelling prejudice that cannot be ameliorated by the District Judge's instructions.   Therefore, he is not entitled to a severance under Rule 14.

Nor is he intitled to a *Bruton* severance.   In *Bruton*, the Supreme Court held that post-arrest statements made by non-testifying co-defendants that facially

74

incriminate other defendants are inadmissible into evidence because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses. The Supreme Court concluded that "where the powerfully incriminating extra-judicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements. *Bruton*, 391 U.S. at 135-36. But Bridges has not identified any such statements of non-testifying codefendants, and so he is not entitled to a severance under *Bruton*.

As a result, Bridges's motion and supplemental motion for severance, [Docs. 513, 584], are **DENIED**.[28]

---

[28]    The Eleventh Circuit has held that a motion to sever is a non-dispositive motion that a magistrate judge may rule upon by order as opposed to a report and recommendation. *United States v. Brown*, 441 F.3d 1330, 1352 (11th Cir. 2006); *see also United States v. Cochran*, 682 Fed. Appx. 828, 842 (11th Cir. Mar. 17, 2017).

6.      **Lartaurus Bridges's motion for speedy trial**

Bridges filed this motion pro even though he is ably represented by counsel. As such, the filing is a nullity.  LCrR 57.1(D)(3).  In any event, matters were pending against co-defendant Davis until he recently withdrew them, and thus Bridges's trial could not start until those matters involving Davis were resolved. Therefore, the motion, [Doc. 566], is **DENIED**.

## III.   CONCLUSION

For all of the above reasons, the undersigned (1) **RECOMMENDS** that Brenton Mitchell's motion to suppress search and seizure of vehicle on April 15, 2018, [Doc. 242], Markeith Thomas's motion to suppress evidence, [Doc. 281], and Arthur Ott's motion to suppress evidence, [Doc. 365], be **DENIED**; (2) **RECOMMEND**S that Brenton Mitchell's motion to dismiss Count Six, [Doc. 372], and Lartaurus Bridges's motion to dismiss indictment for lack of venue, [Doc. 512], be **DENIED**; and (3) **DENIES** Shanquita Potts's motion for a bill of particulars, [Doc. 215], Brenton Mitchell's motion for a bill of particulars [Doc. 241], Lartaurus Bridges's motion for a bill of particulars, [Doc. 511]; Brenton Mitchell's motion to strike alias, [Doc. 336], Lartaurus Bridges's motion for severance, [Doc. 513], Lartaurus Bridges's supplement to motion to sever,

[Doc. 584], and Lartaurus Bridges's motion for speedy trial, [Doc. 566].

The undersigned has now ruled upon all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014).  The Court has not been advised of any impediments to the scheduling of the trial as to this defendant.  Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED, RECOMMENDED, and DIRECTED**, this the 17th day of May, 2021.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

77