# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

United States of America,

v.                                             Case No. 1:18-cr-141-MLB

Markeith Thomas (2), Arthur
Ott (3), Brenton Mitchell (6),
Shanquita Potts (12), and
Lartaurus Bridges (14),

                     Defendants.

_____/

## <u>OPINION & ORDER</u>

The Magistrate Judge issued a Report and Recommendation advising this Court to deny a number of motions filed by various Defendants.  (Dkt. 760.)  Specifically, he recommends denial of motions to suppress filed by Defendants Brenton Mitchell (Dkt. 242), Markeith Thomas (Dkt. 281), and Arthur Ott (Dkt. 365); motions to dismiss filed by Brenton Mitchell (Dkt. 372) and Lartaurus Bridges (Dkt. 512); motions for bill of particulars filed by Shanquita Potts (Dkt. 215), Brenton Mitchell (Dkt. 241), and Lartaurus Bridges (Dkt. 511); a motion to strike alias filed by Brenton Mitchell (Dkt. 336); and a motion for

severance, a supplemental motion to sever, and a motion for speedy trial filed by Lartaurus Bridges (Dkts. 513; 584; 566). The Court adopts the Magistrate Judge's recommendation in its entirety.

## I.   Background and Procedural History

The Magistrate Judge included a detailed recitation of the facts pertinent to Defendants' various motions. (Dkt. 760 at 3–19.) In general, the United States indicted Defendants (and several co-defendants not involved in the motions currently before the Court) with the distribution of marijuana and, for some, the illegal possession of firearms. (Dkt. 287.) The criminal charges arise from the seizure of marijuana those Defendants and their co-conspirators allegedly brought into Atlanta on two occasions from Sacramento, California using privately chartered jets.

The first shipment of marijuana arrived on December 22, 2017. (Dkt. 517 at 6.) Law enforcement officers, acting on a "tip," set up surveillance at Fulton County Airport (also known as "Charlie Brown Field"), and watched as a private jet carrying co-defendant Terrell Davis and several others landed before dawn and parked next to two vehicles— a black Sprinter van and a Ford Econoline van. (*Id.* at 6–8; 12, 27.) Individuals unloaded 37 large rectangular packages in Christmas

wrapping paper from the plane's cargo hold into the Econoline van.  (*Id.* at 9.)  Surveillance agents suspected the packages contained marijuana and arranged a Georgia State Trooper to stop the vehicle after it left the airport.  (*Id.* at 9–10.)  Trooper Ian Moremen made that stop, immediately smelled marijuana coming from the vehicle, and identified three occupants, Defendant Ott (the driver), Defendant Thomas (a passenger), and co-defendant Kevin Harp (a passenger, although, he is not involved in the motions currently before the Court).  (Dkt. 518 at 15–16.)  As he continued to smell marijuana, Trooper Moremen searched the van and found about 520 pounds of marijuana in the 37 packages unloaded from the plane.  (Dkts. 517 at 11; 518 at 15.)  The van was registered to co-defendant Davis, who also paid for the chartered flight.  (Dkt. 517 at 12, 27.)

While that stop occurred, co-defendant Davis and several other passengers from the plane left the airport in the Sprinter van and went to an apartment complex known as "The Compound."  (*Id.* at 11.)  Law enforcement had been surveilling The Compound using a pole camera for some time.  (*Id.*)  They knew co-defendant Davis purchased the complex, installed a gate around it, and used it as a location from which he and

3

others distributed marijuana.  (*Id.* at 11–12.)  The day after the seizure, an Instagram account belonging to co-defendant Davis posted a photo of Davis sitting by a pool with the caption "I've lost more than an man have gained in a lifetime . . . Have you ever lost ah million dollars at one time???"  (*Id.* at 16; Dkt. 669 at 4.)  The marijuana seized the night before had an estimated street-value of $1 million.  (Dkt. 517 at 13.)

The second plane departed Sacramento and arrived at Atlanta's Peachtree-DeKalb Airport on April 15, 2018.  (*Id.* at 22–23.)  Prior to its arrival, law enforcement received intelligence co-defendant Davis visited an area in northern California known as "Murder Mountain" where people grow large amounts of legal and illegal marijuana.  (*Id.* at 15–16.) Co-defendant Davis' tour bus operator also informed law enforcement co-defendant Davis possessed a large amount of cash aboard the bus.  (*Id.*) Agents in California tracked co-defendant Davis as he left Murder Mountain and watched as he and others boarded a private jet at a private airport in Sacramento.  (*Id.* at 18–19.)  They also saw seventeen packages in white wrapping paper loaded into the plane's cargo hold.  (*Id.*)  Based on the similarity of the packaging seized in December 2017, agents

believed the packages contained marijuana.  (*Id.* at 21.)  The plane left Sacramento shortly after midnight.  (*Id.*)

The flight crew had initially planned to land in Kennesaw, Georgia, but changed their destination to Peachtree-DeKalb Airport about 25 minutes before arrival.  (*Id.*)  Before landing, the flight crew also requested that no ground crew help unload the plane, a highly unusual request.  (*Id.*)  Indeed, the airport supervisor told agents that, in his twenty years working at the airport, he had never received such instructions.  (*Id.* at 22.)  The plane landed at about 5:15 a.m.  (*Id.* at 23.)

Before the plane arrived, two vehicles (a black Chrysler 300 and another Ford Econoline van) left The Compound and drove to the airport.  (*Id.*)  The vehicles drove onto the tarmac to where the plane parked.  (*Id.* at 23–24.)  The van backed up to the plane's cargo hold while the car parked near the plane's front steps.  (*Id.*)  When the cargo hold opened, agents could see the packages on the plane and witnessed several people between the van and the cargo hold "like they were getting ready to unload" the packages.  (*Id.* at 25.)  At the same time, passengers from the plane walked back and forth to the Chrysler loading personal belongings into the car.  (*Id.* at 24–26.)  The car then drove away with two occupants,

5

the driver and one passenger. (*Id.*)  A state trooper stopped the car at the front of the airfield and identified the driver as Defendant Mitchell and the passenger as co-defendant William Rhodes. (*Id.* at 26.)  Co-defendant Rhodes traveled as a plane passenger while Defendant Mitchell drove the car from The Compound to meet the plane at the airport. (*Id.* at 26–27, 33.)  Following the stop, law enforcement drove the vehicle to the rear of a building and inventoried it pursuant to their standard practice and written protocol, finding a gun under the driver's seat and another gun in a bag on the passenger's seat. (*Id.* at 32–33, 55.)

While the Chrysler stop occurred, other agents approached the plane. (*Id.* at 27–29.)  They arrested several people, including co-defendant Davis who agents found hiding in the cargo hold with 440 pounds of marijuana contained in the seventeen white packages. (*Id.* at 30–34.)  Agents could smell marijuana emanating from the plane even before opening the cargo hold. (*Id.* at 30.)

Law enforcement later obtained an arrest warrant for Defendant Ott. (Dkt. 518 at 29–30, 34–35.)  A state trooper arrested Defendant Ott on June 19, 2018 after other officers positively identified him as a

passenger in a car.  (*Id*. at 31–34.)  Defendant Ott had a firearm at the time.  (*Id*. at 38.)

Defendants Thomas and Ott challenge the lawfulness of the December 22, 2017 stop of the Econoline van.  (Dkts. 281; 365.)  The Magistrate Judge held two evidentiary hearings to obtain testimony from law enforcement officers involved and from Defendant Ott.  (Dkts. 517; 518.)  He also reviewed videos of the December 2017 stop of the Econoline van from a camera focused on the plane and Trooper Moremen's dashcam.  (Dkt. 765 (Exhibits 1 and 2 from March 12, 2019 hearing).) The Magistrate Judge concluded Trooper Moremen's stop of the van was lawful in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968), because reasonable suspicion existed, if not probable cause, to believe the van's taillights were not on and/or operating in accordance with Georgia law. (Dkt. 760 at 24.)  He further concluded the trooper's subsequent vehicle search was lawful because the odor of marijuana emanating from the van established probable cause to believe the van contained marijuana.  (*Id*. at 28.)

Defendant Ott also moved to suppress the search of his person (and discovery of the firearm) during his arrest on June 19, 2018.  (Dkt. 365

7

at 3–4.)  The Magistrate Judge found his arrest and search lawful because (1) officers had a valid arrest warrant that authorized the stopping of the car in which he was a passenger and (2) it was reasonable for officers to search Defendant Ott incident to his arrest.  (Dkt. 760 at 54–55.)

Defendant Mitchell moved to suppress any evidence taken from the search of the Chrysler in April 2018.  (Dkt. 242 at 1.)  The Magistrate Judge concluded that, considering the totality of the circumstances, probable cause existed to believe Defendant Mitchell was conspiring with co-defendant Davis and the others to bring marijuana into Atlanta at the time of his arrest.  (Dkt. 760 at 39–46.)  He further concluded the United States sustained its burden to show law enforcement properly impounded the Chrysler and found the firearms during a valid inventory search.  (*Id.* at 50–52.)

The United States also charged Defendants Potts and Bridges with conspiring with the other defendants to possess marijuana with the intent to distribute.  Defendant Mitchell, Potts, and Bridges all filed motions for bills of particulars, arguing the United States needed to provide more information about their alleged involvement in the criminal activity.  (Dkts. 215; 241; 511.)  The Magistrate Judge concluded those

Defendants are not entitled to a bill of particulars because the indictment and discovery produced by the United States informs these Defendants of the charges against them with sufficient precision to allow them to prepare their defenses, minimize surprise at trial, and plead double jeopardy in the event of a later prosecution for the same offense.  (Dkt. 760 at 58–60.)  Finally, the Magistrate Judge recommended this Court deny: (1) Defendant Mitchell's motion to strike a reference to his alias ("O.G.") because the United States may need to use the alias to identify Defendant Mitchell in connection with the crimes charged and because Defendant Mitchell had not established any prejudice from the use of the alias, (2) Defendant Mitchell's motion to dismiss the firearm charge in Count Six because 18 U.S.C. § 922(g) does not violate the Second Amendment, (3) Defendant Bridges' motion to dismiss for improper venue because the indictment adequately alleges venue and Defendant Bridges must address the argument against venue at trial, and (4) Defendant Bridges' motion to sever because Defendant Bridges has not shown the amount and quality of evidence against his codefendants as compared to him will cause specific and compelling prejudice that cannot be ameliorated by appropriate jury instructions.  (Dkt. 760 at 61–

77.)  Additionally, the Magistrate Judge recommended this Court regard Defendant Bridges' pro se motion for speedy trial as a nullity because he is represented by counsel.  (*Id.* at 76.)

Defendants Mitchell and Ott filed objections to Magistrate Judge Baverman's Report and Recommendation ("R&R") (Dkt. 760).  (Dkts. 772; 773.)  The other Defendants did not.

## II.    Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's R&R.   28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam). A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  The district judge should "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990) (citation omitted).   For those findings and recommendations to which a party has not asserted objections, a court

must conduct a plain error review of the record. *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

Parties filing objections to a magistrate judge's R&R must specifically identify those findings to which they object. *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). "Frivolous, conclusive, or general objections need not be considered by the district court." *Id.* Defendants Ott and Mitchell raise specific objections but also adopt their prior briefing before the Magistrate Judge in support of their motions to suppress. (Dkts. 772 at 1; 773 at 3.) The Court has reviewed the record evidence and conducted a de novo review of their objections. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) ("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard." (quoting 28 U.S.C. § 636(b)(1))). The Court also reviewed the Magistrate Judge's recommendations as to the other Defendants for plain error as they filed no objections.

## III.   Discussion

### A.   December 22, 2017 Stop and Search of the Econoline Van

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy.  U.S. Const. amend. IV.  Thus, a search or seizure conducted in the absence of a warrant is unconstitutional unless the United States shows it falls within one of a limited number of exceptions to the warrant requirement.  *United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").  The United States must establish the application of the warrant exception by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

A traffic stop is a seizure under the Fourth Amendment.  *See United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009).  A traffic stop is constitutional if a law enforcement officer has probable cause to believe the driver committed a traffic violation or a reasonable suspicion that an

occupant of the car is engaged in criminal activity in accordance with *Terry v. Ohio*. *See id.; see also United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). Criminal activity includes even minor traffic violations. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003). The existence of probable cause or reasonable suspicion is viewed from the standpoint of an objectively reasonable police officer. *See id.* at 1276; *see also Harris*, 526 F.3d at 1337. "[A] court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). There is a two-part inquiry for determining whether an investigative stop is reasonable: (1) whether the officers had reasonable suspicion to seize the individual; and (2) whether the stop was reasonably related in scope to the circumstances which justified the stop initially. *United States v. Acosta*, 363 F.3d 1141, 1144–45 (11th Cir. 2004) (citing *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)). The officer must "be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant" the intrusion of a traffic stop. *Terry*, 392 U.S. at 21.

13

At the evidentiary hearing, Trooper Moremen testified he stopped the Econoline van because the headlights were not illuminated.[1]  (Dkt. 518 at 9.)  Magistrate Judge Baverman reviewed two videos, the plane surveillance and dashcam video, paying particular attention to whether it demonstrated the illumination of the van's headlights and taillights. (Dkt. 760 at 6–7, 24–26.)  He concluded that while the headlights seemed to be on and working, the taillights and license plate light either were not on and/or not working properly.  (*Id.* at 24–26.)  From the dashcam video, for example, he observed the van's taillights exceptional dimness.  (*Id.*) He further recognized that the "dimness" of the van's taillights is particularly apparent when compared to the appearance of taillights on another car driving alongside the van on the road.  (*Id.* at 25.)  Finally, he noted the van's license plate was barely visible (particularly in

---

[1] Audio from the December 22, 2017 stop's daschcam video reiterates Trooper Moremen's testimony because an officer in the car states "the PC on this stop is a van driving with no headlights."  (Dashcam Video at 00:19–:23.)  In the video, Trooper Moremen then approached the side of the vehicle and informed Defendants Ott, Thomas, and Harp he stopped the van because it "ain't got no lights on," and a brief discussion about taillights followed.  (*Id.* at 01:19–:30.)  However, Trooper Moremen again referenced the van's lack of illuminated headlights when repeating why he stopped the van.  (*Id.* at 04:59–05:05.)  The Court's video cites utilize the video's run time for reference because the files provided to the Court do not contain a time stamp.

comparison to the license plate of the other car on the road) until illuminated by Trooper Moremen's headlights, indicating the van's taillights were not on or working properly. (*Id.*) Magistrate Judge Baverman noted that in the plane video, after one passenger from the plane got into the van, the van's headlights were illuminated, but the taillights were not. (*Id.* at 25–26.) Similarly, he concluded that, after the van drove to the other side of the plane, the video shows two times when the headlights (or brake lights) were illuminated but the taillights were not. (*Id.* at 26.) From his review of the videos, Magistrate Judge Baverman concluded Moremen's stop of the van was a lawful *Terry* stop since reasonable suspicion existed, if not probable cause, to believe the Econoline van's taillights were not on and/or operating in compliance with O.C.G.A. §§ 40–8–20 and 40–8–23(d).[2] (*Id.* at 27.) The Court has reviewed the videos and surrounding testimony, applauds the thoroughness of Magistrate Judge Baverman's analysis, and adopts it completely.

---

[2] O.C.G.A. § 40–8–23 requires vehicles in Georgia be equipped with taillights, including lights that illuminate the license plate from a certain distance, and that taillights be wired to operate whenever headlights are lighted. O.C.G.A. § 40–8–20 requires vehicles to display all necessary lights from a half-hour after sunset until a half-hour before sunrise.

In his objections, Defendant Ott does not really challenge Magistrate Judge Baverman's conclusion that the van's rear lights (including the taillights and the license plate light) were not working properly.  (Dkt. 772.)  Instead, he argues the "uncontroverted evidence" shows the van's illuminated headlights and thus Magistrate Judge Baverman's conclusion about the taillights conflicts with Trooper Moremen's assertion that he stopped the vehicle for not having its headlights on.  (*Id.* at 4.)

Neither party probed Trooper Moremen to distinguish between his recollection of the headlights versus the taillights.  (Dkt. 518 at 6–20.) Consequently, the Court rejects Defendant Ott's suggestion Magistrate Judge Baverman's finding regarding the taillights somehow conflicts with the trooper's testimony.  Additionally, even if Trooper Moremen misidentified the van's lack of illuminated headlights, that alone would not invalidate the lawfulness of this stop.  Reasonable suspicion and probable cause are viewed objectively, and thus it is irrelevant that Trooper Moremen recalled stopping the van for having its headlights off. "[T]he issue is not whether the particular officer involved 'actually and subjectively had the pertinent reasonable suspicion, but whether, given

the circumstances, reasonable suspicion objectively existed to justify [the investigatory stop].'" *Harris*, 526 F.3d at 1338 (quoting *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006)).

Having reviewed the videos, the Court agrees with Magistrate Judge Baverman's conclusion that the totality of circumstances provided a reasonable suspicion the Econoline van Defendant Ott drove lacked sufficient taillight illumination.  This is most obvious in the dashcam video, particularly when comparing the rear of Defendant Ott's vehicle with the illumination of the taillights/license plate light on a pickup truck Defendant Ott passes on the road.  (Dashcam video at 00:01–:11.)  It is also obvious when, as Defendant Ott begins stopping for the trooper, he applies the brake and then takes his foot off the brake, clearly demonstrating the van lacks adequately illuminated taillights.  (*Id.* at 00:16–:39.)  The plane video with footage from the Fulton County Airport also confirms this fact.  As the van drives from the front of the plane to the rear, the headlights are illuminated, but not the taillights.  (Plane Video at 04:56–05:05.)  At other times, brake lights can be seen but, when the brakes are depressed, the entire back of the van goes dark.  (*Id.* at 06:25–:30.)  Further, when the van leaves the airport the headlights are

clearly illuminated, while the taillights are not. (*Id.* at 13:38–:50.) Thus, the Court overrules Defendant Ott's objection to Magistrate Judge Baverman's conclusion the stop of the van was a lawful vehicle stop and a valid exception to the Fourth Amendment's warrant requirement.

Upon stopping the van, Trooper Moremen detected the smell of marijuana coming from the vehicle.[3] (Dkt. 518 at 12.) The odor of marijuana by itself established probable cause for a warrantless search of the van.[4] *See e.g., United States v. Flippo*, 759 F. App'x 907, 909 (11th Cir. 2019) (finding odor of marijuana provides probable cause for warrantless search) (citing *United States v. Tobin*, 923 F.2d 895, 1512)); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) (recognizing smell of marijuana gives rise to probable cause for warrantless search). Defendant Ott does not argue to the contrary. Instead, he argues the Court should suppress evidence of the marijuana found in the back of the van as "fruit" of the unlawful stop. (Dkt. 772 at 5.) Rejecting his claim

---

[3] Trooper Moremen informed another officer present at the December 2017 stop of "a really strong smell of weed in the car." (Dashcam Video at 03:42–:46.)

[4] Trooper Moremen notified Defendants Ott, Thomas, and Harp that in his job, "the odor of marijuana gives me probable cause to search your vehicle." (Dashcam Video at 05:25–:28.)

18

the December 2017 stop was unconstitutional, the Court likewise overrules his objection to the Magistrate Judge's conclusion that this Court should deny Defendant Ott's motion to suppress the marijuana.

## B.    The April 15, 2018 Stop and Search of the Chrysler 300

Law enforcement stopped and arrested Defendant Mitchell as he drove a Chrysler 300 away from Peachtree-DeKalb Airport on April 15, 2018.  (Dkt. 517 at 50.)  Agents did not have a warrant for his arrest.

A warrantless arrest is constitutionally valid only when there is probable cause.  *See United States v. Watson*, 423 U.S. 411, 417 (1976); *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982).  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (quoting *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992).)  This looks at the totality of the circumstances.  *Illinois v. Gates*, 462 U.S. 213, 233 (1982).  So, when a group of officers conducts an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.  *United States v. Goddard*,

19

312 F.3d 1360, 1362 (11th Cir. 2002).  To determine whether an officer had probable cause to arrest an individual, the court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotations omitted)).  "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Id.* (internal punctuation marks and citations omitted).  Finally, the government bears the burden of demonstrating the legality of a warrantless arrest.  *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984); *Tobin*, 923 F.2d at 1521 n.21.

In general, association with a known drug dealer, without more, is insufficient to establish probable cause.  *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").  Likewise, a person's mere presence at the scene of a crime is not probable cause for a warrantless

arrest. *United States v. Di Re*, 332 U.S. 581, 593 (1948). But an officer is not required to resolve all inferences and all factual conflicts in favor of the suspect. An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect. *Bailey v. Board of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992).

Defendant Mitchell objects to Magistrate Judge Baverman's determination probable cause existed when law enforcement arrested Defendant Mitchell following the stop of the Chrysler. (Dkt. 773 at 2.) He claims the available evidence merely shows he drove a vehicle that parked near the plane and that one passenger from the plane and some personal items entered the car. (*Id.*) He claims that because the car he drove never approached the cargo hold and because the conspirators loaded marijuana into a van rather than a car in December 2017, no probable cause existed "to justify the warrantless stop and seizure." (*Id.* at 3.)

Defendant Mitchell cuts the evidence too narrowly. The issue is not whether probable cause existed to believe the car contained marijuana.

Rather the issue is whether probable cause existed to believe the driver of the vehicle was involved—at that time—in the conspiracy to bring marijuana into Atlanta using the privately chartered plane. This Court agrees with the Magistrate Judge's conclusion that the evidence sufficiently showed probable cause of Defendant Mitchell's involvement in the conspiracy. (Dkt. 760 at 39–45.) By the time the plane landed in Atlanta on April 15, 2018, law enforcement knew of co-defendant Davis' efforts, with several others' assistance, to fly marijuana into Atlanta from northern California. (Dkt. 517 at 35–36.) Law enforcement had every reason to believe co-defendant Davis and affiliates intended to do so on that occasion. (*Id.*) They seized marijuana worth more than $1 million from the group just months before in Atlanta and read co-defendant Davis' social media posts lamenting the seizure. (*Id.* at 13.) And, law enforcement knew co-defendant Davis and his co-conspirators used private planes to fly the drugs into Atlanta and wrapped the packages in paper. (*Id.* at 39–40.)

On the day of the stop, they knew co-defendant Davis was traveling to Atlanta from northern California, visited places known to supply legal and illegal marijuana, and possessed large amounts of cash on his tour

bus during the trip to California.  (*Id*. at 16–17.)  They knew co-defendant Davis and some of his associates loaded packages like those seized in December 2017 into the plane's cargo hold.  (*Id*. at 20, 39–40.)  They knew co-defendant Davis and those on the plane with him changed the arrival destination just minutes before landing and declined professional ground crew assistance (a strange request in the private charter business).  (*Id*. at 21–22.)  They knew the plane landed before dawn, the same time the December 2017 flight arrived.  (*Id*. at 23.)

During the December 2017 seizure, law enforcement witnessed two vehicles arrive at the airport to meet the plane, one to carry the drugs away and one to drive co-defendant Davis and others back to The Compound.  (*Id*. at 8; 10–11.)  On the morning of the April 2018 seizure, they saw the Chrysler 300 and a cargo van leave The Compound in tandem and drive to the airport (again in tandem) to meet the plane and its occupants.  (*Id*. at 23.)  Because the two vehicles went to the airport where the plane landed rather than the original destination, it suggests the occupants of those vehicles were in communication with the passengers on the plane.  While the van parked at the rear of the vehicle as if to receive items from the cargo hold, Defendants Mitchell and

23

Rhodes loaded the Chrysler with personal belongings from the plane, entered it, and drove away. (*Id.* at 25–26.)  From what law enforcement knew and saw this looked like a repeat of the December 2017 drug smuggling operation. (*Id.* at 41.)

Like Magistrate Judge Baverman, this Court rejects any suggestion the evidence demonstrates Defendant Mitchell's mere presence at the wrong place at the wrong time.  By the time law enforcement apprehended Defendant Mitchell, probable cause existed that co-defendant Davis and others landed at the airport with marijuana and the individuals flying with co-defendant Davis and meeting him at the airport aided his drug trafficking scheme.  This is not like *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007), where the Eleventh Circuit held that evidence a defendant merely drove away from a location connected to a drug investigation and lied to police about where he had been did not establish probable cause.  It is also dissimilar to *United States v. Pintado*, 715 F.2d 1501 (11th Cir. 1983), where law enforcement found the defendant locked in an upstairs bedroom of a house where unidentified people loaded drugs into the ground floor just minutes before.  In *Pintado*, no evidence suggested the defendant knew others

loaded drugs into the floor below him nor that he assisted the drug trafficking in any way. *Id.* at 1505. Here, Defendant Mitchell drove from The Compound with the van set to receive the marijuana, met drug traffickers where they arrived with the drugs, and picked up one of the passengers. (Dkt. 517 at 49–50.) This all shows coordination with those undeniably involved in the drug trafficking organization in a way that merely driving from a location under suspicion does not. By coordinating with the van to leave The Compound, arrive at the airport, and pick up at least one passenger, Defendant Mitchell facilitated the removal of the co-conspirators and their personal belongings from the scene.

People involved in the distribution of illegal drugs do not usually conduct business in the open or in front of strangers. *United States v. Ashcroft*, 607 F.2d 1167, 1171 (5th Cir. 1979) (finding probable cause to arrest defendant despite his claim of mere presence, noting that "a drug sale involving large quantities of cocaine is a private transaction that does not usually occur in the open or in the presence of strangers"). Because this transaction involved hundreds of pounds of marijuana worth hundreds of thousands of dollars makes that all the more likely. Since the organization recently lost $1 million worth of marijuana makes

it all the more likely they would exclude outsiders. And, Defendant Mitchell was certainly not an outsider because he left for Peachtree-DeKalb Airport from The Compound (a secure area where the organization operated). (Dkt. 517 at 44–45.) And, the flight crew's instruction to ground personnel that the aircraft's occupants did not want assistance in unloading their cargo (knowing that meant they would have to unload about 400 pounds of marijuana) suggests this organization did not want strangers around. (*Id.* at 22.) The fact agents could smell marijuana in the plane's vicinity reasonably supports Defendants' desire to conceal their drug trafficking activities. (*Id.* at 30.) For all these reasons, this Court agrees with the Magistrate Judge's conclusion the evidence known to law enforcement provided probable cause to believe Defendant Mitchell participated in coordinated activity to bring marijuana into Atlanta from California and thus law enforcement lawfully arrested him.

After arresting Defendant Mitchell, ATF agents impounded his car and performed a warrantless, inventory search, finding a gun under his seat and in the passenger's seat. (*Id.* at 32, 48, 55.) The Fourth Amendment validates warrantless inventory searches conducted

pursuant to an established procedure on legally impounded vehicles. *South Dakota v. Opperman*, 428 U.S. 364, 372–73 (1976). Specifically, law enforcement officers may conduct an inventory search of a car properly in their custody to adequately protect the owner's property in police custody, to protect the police from claims of lost or stolen property, and to protect the police from potential danger. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Put differently, a warrantless inventory search of an automobile made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents" is a reasonable police intrusion that does not offend Fourth Amendment principles. *Opperman*, 428 U.S. at 372–73. Law enforcement must conduct the search according to standardized criteria intended to accomplish caretaking purposes rather than as a ruse to discover evidence of a crime. *Florida v. Wells*, 495 U.S. 1, 4 (1990). The search must be reasonable given its caretaking purpose. *United States v. Laing*, 708 F.2d 1568, 1571 (11th Cir. 1983).

Having reviewed ATF's written procedure for conducting inventory searches of vehicles taken into custody during investigations and the way these agents searched the Chrysler, Magistrate Judge Baverman

recommended this Court deny Defendant Mitchell's motion to suppress (Dkt. 242) the Chrysler's search.  (Dkt. 760 at 52.)   In his objections, Defendant Mitchell does not challenge Magistrate Judge Baverman's conclusion the ATF had a standard, written procedure and applied that procedure to search the Chrysler.  (Dkt. 773.)  He does not argue law enforcement used the inventory search as a mere ruse to further their investigation.  (*Id.*)  Having reviewed the record, the Court agrees with Magistrate Judge Baverman in this regard.

Defendant Mitchell nevertheless argues the ATF, rather than follow its written procedure, failed to give him the required opportunity to arrange for someone to come and pick up his car.  (*Id.* at 3.)  The Court disagrees.   No evidence suggests Defendant Mitchell made such a request.  Even if he had, the agents would not have been required to honor it.  The Eleventh Circuit does not require law enforcement to allow an individual to make "alternative arrangements" for a vehicle before performing a good faith inventory search.  *See Sampson v. Taylor*, 967 F.2d 1533, 1541 (Supreme Court precedent "does not support [car owner's] argument that police—as a constitutional matter—must give a driver an opportunity to make his or her own disposition of the vehicle").

28

Here, the agents actively engaged in an investigation, not just at the scene of Defendant Mitchell's arrest, but also back at the airport. To require the agents to stop their investigation, allow Defendant Mitchell to call or otherwise contact someone to take the car, and then wait with the car for that person to arrive would put too great a burden on them during their investigation. Such a burden may even compromise the investigation and endanger officers. Defendant Mitchell concedes agents performed the search according to standardized criteria and for caretaking purposes while continuing their investigation away from the car. Accepting such, the Court declines to impose a requirement on law enforcement to divert resources at a critical time in the investigation to accommodate Defendant Mitchell's unrequested effort to have someone else come get his car.

Alternatively, Defendant Mitchell argues the warrant requirement's inventory search exception does not apply because law enforcement stopped him on private property rather than on a public road. (Dkt. 773 at 3.) The Court agrees with Magistrate Judge Baverman's conclusion this distinction makes no difference. (Dkt. 760 at 51.) No law suggests the inventory exception applies only on public

property or alternatively that it does not apply on private, third-party owned property. Had law enforcement stopped Defendant Mitchell on his own property (or maybe the property of someone he knew and could expect to take custody of the vehicle) things might be different as they would not have to take custody of such a vehicle. Here, however, that is not what happened. Law enforcement stopped Defendant Mitchell on private property accessible to the public. (Dkt. 517 at 32.) The purpose and legitimacy of inventory searches applies, just as it would on a public road. *United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990) (finding it was not unreasonable to impound and inventory a vehicle, even though it was parked in a parking lot of a private corporation, where the driver was arrested and no one was present to take custody of the vehicle); *United States v. Baskin*, No. 1:14–CR–293–TCB–AJB, 2016 WL 5334754, at *3 (N.D. Ga. Sept. 23, 2016) (rejecting private-property arguments against impound by holding "Baskin's vehicle was impounded and searched because Baskin was arrested, there was no other person to retrieve the vehicle, and the vehicle was not on Baskin's residence or property, which was in accordance with the department's policies . . .").

The Court thus adopts the Magistrate Judge's recommendation, overrules Defendant Mitchell's objections, and denies Defendant Mitchell's motion to suppress.

## C.    Defendant Mitchell's Other Objections

The Court likewise agrees with the Magistrate Judge's determination this case does not require a bill of particulars.  (Dkt. 760 at 60–61.)  Federal Rule of Criminal Procedure 7(c)(1) states indictments shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.  Rule 7(f) authorizes the Court to direct the government to file a bill of particulars.  "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *United States v. Warren*, 772 F.2d 827, 837 (11th Cir. 1985); *see also United States v. Hassoun*, 477 F. Supp. 2d 1210, 1227–28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense.").

Defendant Mitchell contends he needs a bill of particulars to understand which firearm recovered from the Chrysler the United States "attributes" to him. (Dkt. 773 at 3.) He also claims the government needs to tell him "when, with whom and how" he joined the conspiracy. (*Id.* at 4.) The Court disagrees. Regarding the former, the United States charged Defendant Mitchell in Count Five with possessing a firearm in furtherance of a drug trafficking crime following his arrest on April 15, 2018. (Dkt. 287 at 4.) Law enforcement found two firearms in the car he drove, but the United States did not identify which of those firearms supports Count Five. (Dkt. 517 at 55.) Because the indictment alleges his arrest date and further alleges, he possessed the firearms along with co-defendant Rhodes, it obviously notifies Defendant Mitchell allegedly possessed either or both firearms found in the car. The United States may obtain conviction by showing he possessed either the gun found under his seat or the gun found in co-defendant Rhodes' seat. A jury could convict him of actual, constructive, sole, or joint possession of either firearm. Additionally, the specificity of Count Six's allegation (charging Defendant Mitchell with possession of the 9mm pistol found under his seat in the car while under indictment for a felony offense) demonstrates

the United States' desire for flexibility in Count Five's allegation.  (Dkt. 287 at 4.)  The United States is not required to pick and disclose its legal theory of possession in Count Five in advance of trial and before it hears the testimony from available witnesses.   Here, Defendant Mitchell possesses enough information to avoid surprise, prepare his defense, and plead double jeopardy based on the information provided.

As to his second request for information, the United States is not required to explain how, when, or with whom Defendant Mitchell joined the conspiracy to obtain his conviction.  It may not even know.  The United States merely needs to show participation as a member of the conspiracy on the date alleged in the indictment.  No case law suggests the United States must explain its theory as to how a conspirator joined a conspiracy to comply with the Federal Rules of Criminal Procedure, any constitutional requirement, or any sense of fundamental fairness.

Defendant Mitchell failed to show any prejudice resulting from the United States' use of his alias "O.G." or demonstrate why the United States need not use his alias to explain the evidence.  He also presented no case law suggesting the Second Amendment precludes his prosecution for possessing a firearm while under indictment pursuant to Georgia's

First Offender law.  Having reviewed the record de novo, this Court agrees with Magistrate Judge Baverman's recommendation to deny these motions.

### D.    Remaining Motions

Defendants Thomas, Potts, and Bridges filed no objections to the R&R. Defendant Thomas, a passenger in the Econoline van stopped by Trooper Moremen on December 22, 2017, moved to suppress that stop. (Dkt. 281.)  For the same reasons it denies Defendant Ott's motion to suppress the stop of the van, the Court also denies his motion.[5]  The Court also reviewed for clear error the Magistrate Judge's recommendation this Court deny (1) Defendant Potts' and Bridges' motions for bill of particulars, and (2) Defendant Bridges' motions to dismiss for improper venue, to sever, and for speedy trial.   The Court adopts those recommendations.

---

[5] The Court agrees with Magistrate Judge Baverman's legal conclusion that, as a mere passenger in the van, Defendant Thomas lacks standing to challenge the subsequent search of the van. *See Rakas v. Illinois*, 439 U.S. 128, 148–49 (1978) (defendants did not have a legitimate expectation of privacy in the glove compartment or area under the seat in a car in which they were "merely passengers").

## IV.   Conclusion

The Court **OVERRULES** Defendant Ott's and Mitchell's objections to the Magistrate Judge's Report and Recommendation.  (Dkts. 772; 773). The Court **ADOPTS** the Report and Recommendation and denies the motions to suppress filed by Brenton Mitchell (Dkt. 242), Markieth Thomas (Dkt. 281), and Arthur Ott (Dkt. 365); motions to dismiss filed by Brenton Mitchell (Dkt. 372) and Lartaurus Bridges (Dkt. 512), motions for bill of particulars filed by Shanquita Potts (Dkt. 215), Brenton Mitchell (Dkt. 241), and Lartaurus Bridges (Dkt. 511); a motion to strike alias by Brenton Mitchell (Dkt. 336); and motions for severance, supplemental motion to sever, and motion for speed trial by Lartaurus Bridges (Dkts. 513; 584; 566).

**SO ORDERED** this 9th day of July, 2021.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE